Argued and submitted February 16, resubmitted en banc August 3, parenting time schedule modified; child support award vacated and remanded for recalculation; name change reversed; otherwise affirmed September 21, petition for review denied December 6, 2005 (339 Or 609)

In the Matter of
Kailey Christison, a Minor Child.

Steve T. McARTHUR,
*Respondent,*

*and*

Amy B. PARADIS,
fka Amy B. Christison,
*Appellant.*

01C-34305; A123354

120 P3d 904

Margaret H. Leek Leiberan argued the cause for appellant. With her on the briefs was Case & Dusterhoff, LLP.

J. Michael Alexander argued the cause for respondent. With him on the brief was Swanson, Lathen, Alexander & McCann, PC.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Schuman, Ortega, and Rosenblum, Judges.

EDMONDS, J.

## EDMONDS, J.

Mother appeals a judgment establishing custody, parenting time, and support for her minor child, and ordering child's last name to be changed to father's last name. She assigns error to the trial court's orders pertaining to father's parenting time, to father's current and past child support obligation, and to changing child's last name. In particular, this case presents the issue of what legal parameters apply when parenting time conflicts with the custodial parent's religious practices. On *de novo* review, ORS 19.415(3), we reverse in part and affirm in part.

Child was born out of wedlock to mother and father in September 1992. Mother has had custody of child from birth. Father has also been involved with child and has paid some child support to mother for most of child's life. In the summer of 2001, child disclosed to mother that she had been sexually abused by mother's current husband's father. Mother and her husband contacted the police in early September 2001; charges were brought against husband's father, and husband's father eventually pleaded guilty to one of the charges. Mother did not contact father about the abuse, but child eventually told father of the abuse in mid-September 2001.

Sometime during the fall of 2001, mother learned that her husband's father had been released from jail, and, out of concern for child's safety, mother sent child to live with mother's sister in Idaho, but she did not inform father of that action. Father eventually learned of the move and filed a petition requesting custody of child and child support from mother.[1] Mother counterclaimed, requesting that the court establish paternity, grant her sole legal and physical custody of child, establish a child support obligation consistent with the child support guidelines, and require father to pay past child support. Before trial, mother and father agreed that mother would retain custody of child, but they disagreed

---

[1] Although child was born out of wedlock, the provisions of ORS 107.093 to 107.425 regarding custody and child support apply to mother and father. ORS 109.103; *see also State ex rel Johnson v. Bail*, 140 Or App 335, 337 n 1, 915 P2d 439 (1996), *aff'd*, 325 Or 392, 938 P2d 209 (1997).

about father's parenting time schedule and the amount of child support. Father also requested that child's name be changed to his last name, and mother objected. The trial court held a hearing on those remaining issues and issued a judgment that established paternity in father, granted mother custody of child, established a parenting plan detailing father's visitation schedule, required father to pay $55 per month in child support, but ordered no past child support, and changed child's last name to father's last name. ORS 107.105.

On appeal, mother assigns error to the trial court's rulings regarding father's parenting schedule, the amount of child support, the failure to order past due child support, and the name change. We start with her first and second assignments of error, both of which pertain to the parenting time schedule. Before trial, the trial court ordered a custody evaluation. At trial, the custody evaluator's recommended parenting plan was admitted into evidence. The proposed plan recommended that on alternate weekends, child would "be with her father beginning at sundown on Saturday until 9:00 [a.m.] on the following Wednesday when Father will take her to school or return her to her mother's home." The plan also recommended that father have child overnight on alternate Tuesdays, and that in the summer, child would alternate two-week periods of time with mother and father.

At trial, father asked the court to follow the custody evaluator's plan, except that he asked that his alternate weekend schedule begin on Friday evening and end on Tuesday morning. Mother asked the court to follow the custody evaluator's recommendation that the weekend visitation begin on Saturday at sundown, but end on Tuesday morning instead of Wednesday morning.

Mother's request, and the custody evaluator's reasoning for starting visitation on Saturday evening, pertain to mother's religious practices. Mother belongs to and attends a congregation of a church called The Church of God, Body of Christ. This particular congregation consists of mother, child, child's maternal grandmother, mother's sister, and the sister's children. Mother strictly observes a Sabbath, which according to her religion, begins at sundown Friday and ends

at sundown Saturday. According to the maternal grandmother, their religious practices proscribe watching television and listening to the radio on the Sabbath. They are not permitted to leave home except to travel to worship services and are required to participate in worship services on the Sabbath. Mother testified that her Sabbath observance is a major tenet of her religion and that child actively participates in and embraces the Sabbath practice. Child's therapist verified that child had "talked about her religion a number of times" and that child was "quite knowledgeable" about the religion.

In arranging for his parenting time in the past, father had honored mother's requests that child be with mother to observe the Sabbath. Child's therapist testified that child told the therapist that she wanted to continue "going to practice her religion on Saturdays," and that, in the therapist opinion, "a change in her schedule would [not] be in [child's] best interest." As already noted, the custody evaluator recommended a parenting time schedule that would allow child to continue Sabbath observance with mother. The evidence further indicates that if father has child on the Sabbath observance day, child will not engage in Sabbath observance activities associated with mother's religion.

Father testified at the hearing that he understood that child had been raised in mother's faith and that he understood the importance of the Sabbath observance to mother's faith. He expressed no concern about child's participation in mother's faith. Rather, he testified that he desired parenting time with child from Friday evening to Monday morning "in order for me to have a normal weekend. * * * [W]e can't go anywhere, or do anything as a family unit. We're not able to go away for the weekend or do anything as such, or vacations." Father also testified that he takes child to his religious services on Sunday.

The trial court concluded that mother's Sabbath observance request was not in the best interests of child. It found that child "would not be allowed to develop a typical traditional relationship with [father] and his family if she was prevented from attending ALL weekend activities with them." (Uppercase in original.) The court ordered a parenting

plan that gave father parenting time on alternating weekends starting Friday afternoon and ending Monday morning, pursuant to Marion County Supplementary Local Rule (SLR) 8.075.[2]

■ On appeal, mother contends that the trial court should have followed the custody evaluator's recommended plan, because only that plan allowed child to observe the Sabbath practice of mother's religion as she has her entire life. Mother argues that, because she is the custodial parent, she should have the right "to control a child's religious training," that courts traditionally recognize the importance of a religion's strict Sabbath observance, and that child's religious identity is tied to mother's religion and its Sabbath observance. Father counters that it is in the best interests of child for child to have "frequent and continuing contact" with him and that there is no statutory authority for the assertion that the custodial parent has the right to control a child's religious training in derogation of the noncustodial parent's parenting time both under Oregon statute and under the father's federal constitutional right to parent his child.

Insofar as we can ascertain, the issue presented by this case is an issue of first impression under Oregon law. Moreover, while the resolution of the issue potentially implicates competing constitutional interests, we believe that those interests can be accommodated under the policy inherent in Oregon statutes governing parenting time. ORS 107.105(1)(b) provides, in part, that "the court shall develop the parenting plan in the best interest of the child[.]" ORS 107.102(4)(b) adds, "In developing a parenting plan * * * the court may consider only the best interests of the child and the safety of the parties." Finally, ORS 107.137 provides some guidance about the factors that we should consider in determining the best interests of the child. It provides, in part:

"(1) In determining custody of a minor child under ORS 107.105 or 107.135, the court shall give primary consideration to the best interests and welfare of the child. In

---

[2] SLR 8.075 provides, *inter alia*, that "[t]he child shall be with the noncustodial parent every other weekend, beginning on Friday night at 7:00 p.m. and ending the following Monday morning."

determining the best interests and welfare of the child, the court shall consider the following relevant factors:

"(a)   The emotional ties between the child and other family members;

"(b)   The interest of the parties in and attitude toward the child;

"(c)   The   desirability   of   continuing   an   existing relationship;

"(d)   The abuse of one parent by the other;

"(e)   The preference for the primary caregiver of the child, if the caregiver is deemed fit by the court; and

"(f)   The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. However, the court may not consider such willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in a pattern of behavior of abuse against the parent or a child and that a continuing relationship with the other parent will endanger the health or safety of either parent or the child."

Consistent with the policy of the above statutes is our stated goal "to promote a strong relationship between children and their noncustodial parents" by the creation of parenting plans. *Sundberg and Sundberg*, 150 Or App 349, 355, 946 P2d 296 (1997), *rev den*, 326 Or 464 (1998).

In assessing the factors in ORS 107.137(1), the trial court found that mother's "religious practices which are unique and very narrow by traditional standards," prevented her from facilitating "a close and continuing relationship between [father] and [child]." The court also stated:

"[I] find that [mother and the maternal grandmother] are clearly placing their beliefs and interests ahead of [child]'s in regard to religious practices. [Child] has two parents and should be allowed to develop her relationship with each, including their religious beliefs. At some juncture when [child] is older, she can choose her own path regarding religious practices."

We appreciate that the trial court was faced with a difficult issue, as are we on *de novo* review. However, given

the legislature's direction to focus on the child's best interests, we find the trial court's comparison of mother's and father's religious practices to be inapt under the circumstances. There is no evidence that mother's religious practices are harmful to child's welfare.[3] In fact, father does not contend that mother's Sabbath practices are harmful to child. Because the legislature has directed us to focus on the best interest of the child involved, these kinds of issues must be decided on a case-by-case basis, depending on its peculiar facts. The evidence indicates that consistency is important for child. Child has practiced mother's Sabbath observance her entire life. She expressed to her therapist her preference for being allowed to continue her practices. Both the custody evaluator and child's therapist recommended that father's parenting time conform to the Sabbath observance period because that was in the best interests of child. We recognize the persuasiveness of father's argument that to permit child to continue her Sabbath practice could prevent her from developing a "typical traditional relationship with her father and his family[,]" because she would not be available for weekend activities that occur on Saturdays. On these facts, given the policy adopted by the legislature in ORS 107.105(1)(b), the infringement on father's opportunity to develop what he has termed a traditional family relationship with child must yield to the stability and continuity afforded to child by mother's position.

The custody evaluator recommended a parenting schedule that results in father having frequent and more parenting time than the standard established by SLR 8.075. Furthermore, the custody evaluator's parenting schedule allowed father to have two-week parenting periods with child in the summer, with no requirement that child return to mother for Sabbath observance during that period. In other words, under the custody evaluator's plan, father has 13 consecutive days during summer visitation to engage in activities with child. We are persuaded on this record that the custody evaluator's recommended parenting plan for weekends

[3] ORS 107.137(3) provides:

"In determining custody of a minor child under ORS 107.105 or 107.135, the court shall consider the conduct, marital status, income, social environment or life style of either party only if it is shown that any of these factors are causing or may cause emotional or physical damage to the child."

and summers will maximize parenting time while at the same time provide for stability and continuity in child's life. We therefore adopt the custody evaluator's recommendation regarding weekend visitation as well as the recommendation that father and mother alternate two-week blocks of time in the summer, with father's parenting time beginning at sundown on Saturday and ending 13 days later at sundown Friday. The remainder of the trial court's parenting time schedule is to continue in effect.[4]

■　Mother also assigns error to the court's order that father pay $55 per month in child support. In particular, mother argues that the court should not have accepted father's testimony that he earns only $1,723 per month, and that, based on her calculations, father earns $5,100 per month. Father counters that the evidence supports the trial court's finding regarding father's income and that any other finding would be mere speculation.

Father currently works as an auto rebuilder and has done so since sometime in 2002. In his Uniform Support Affidavit, father listed a net loss of $7,320 from his business for the year 2002. In determining his current income, he testified that he consulted his business ledger and "took the total sales * * * for the year, minus the total expenses and cost of goods sold * * * and then came up with a figure, and then took the total cost of doing business, which would be the expenses, such as rent, electricity and such as those, and then divided it by 12." Father testified that, if he gets behind in his business, he obtains "working capital" from a business called Household Finance, or from various VISA cards.

In 2000, father took out a mortgage, in his name only, for $128,838, with monthly payments totaling $1,172 per month. Father testified that, since he has been self-employed as an auto rebuilder, he has fallen in arrears "off and on," and, at the time of trial, he was behind 45 days in his mortgage payment. Father testified that he pays for his mortgage either from his business account or with cash from the sale of an automobile. The evidence indicates that father

---

[4] Our opinion should be understood to mean only that the overarching focus is on the best interests of the child and the accommodations for making that determination must be decided on a case-by-case basis.

has access to two accounts—one for his business and one that he holds jointly with his wife. His wife also has her own account, into which her paycheck from her employer is automatically deposited. According to father, his wife earns $36,000 to $37,000 per year.

Mother offered as evidence father's banking deposit history from January 2001 through April 2003. The account history indicates that father rarely used his business account until August 2002. At that time, father began depositing money with notations either referring to stock numbers that coincide with automobiles in father's ledger, or referring to "hfc." Other than father's testimony regarding loans he has received from Household Finance, there is no evidence in the record indicating the meaning of "hfc." The "stock" and "hfc" deposits made into father's accounts averaged $15,049.50 per month during the period of August 2002 to April 2003. Father's ledger indicates that father sold cars during this same time period for a monthly average of $16,443.94. Father testified that sometimes he is paid in cash, and sometimes not all of the cash received is deposited in his bank accounts. Our review of the record indicates that there is, in fact, little in common between the amounts that father indicates that he obtained from selling cars and the amounts of father's deposits.

Mother testified that, based on the monthly averages in both accounts that father has access to, she believes that father's income is approximately $5,100 per month. Her conclusion was based on a 28-month history of father's private joint account with his wife and a 13-month history of father's business account, which together totaled a monthly average of $17,312.21. She argued at trial that $5,100 per month would be consistent with a reasonable profit margin for an auto rebuilder. Furthermore, mother argued, father could not have obtained a mortgage with a monthly payment of $1,172, if he only earned $1,723 per month. Mother concluded therefore that father has more income than he reported to the trial court.

After evaluating the evidence, the trial court found the following:

"Conflicting evidence was presented regarding Father's income as a car rebuilder. Father's record keeping is rudimentary at best. Mother asks the court to find that Father's income exceeds $1,723.00 per month. Based on the evidence presented by Mother, it is difficult to believe that Father['s] income is only $1,723.00 per month. However, without testimony of an individual in the car rebuilding business concerning the typical profit margin, adopting an arbitrary figure of 30% would be inappropriate. Evidence regarding deposits to bank accounts either owned individually or jointly by Father and his current wife, reveal deposits well in excess of Father's alleged income. However, there was no proof regarding the source from which the deposits came, and whether in fact the deposits were earned by Father or may have been cash advances or loans."

ORS 25.275 provides, in part:

"(1)  The Division of Child Support of the Department of Justice shall establish by rule a formula for determining child support awards in any judicial or administrative proceeding. In establishing the formula, the division shall take into consideration the following criteria:

"(a)  All earnings, income and resources of each parent, including real and personal property;

"(b)  The earnings history and potential of each parent;

"(c)  The reasonable necessities of each parent;

"(d)  The ability of each parent to borrow;

"(e)  The educational, physical and emotional needs of the child for whom the support is sought;

"(f)  The amount of assistance that would be paid to the child under the full standard of need of the state's IV-A plan;

"(g)  Preexisting support orders and current dependents; and

"(h)  Other reasonable criteria that the division may find to be appropriate.

"(2)  The formula described in subsection (1) of this section must also comply with the following standards:

"(a)  The child is entitled to benefit from the income of both parents to the same extent that the child would have

benefited had the family unit remained intact or if there had been an intact family unit consisting of both parents and the child.

"(b)   Both parents should share in the costs of supporting the child in the same proportion as each parent's income bears to the combined income of both parents."

For purposes of determining the child support obligation where a parent is self-employed, "gross income is defined as gross receipts minus costs of goods sold minus ordinary and necessary expenses required for self-employment or business operation." OAR 137-050-0350. ORS 25.290 provides that the child support obligor "has the burden of proof and must furnish documentation to support any [ordinary and necessary] offsets claimed."

Through his ledgers, father produced evidence of his gross income, as required by OAR 137-050-0350. Mother argues that because she produced evidence of a deposit history with average monthly amounts much higher than his stated income, father had the burden to justify the difference between the two. We do not agree. There is no statute, rule, or case authority that we can find that supports the argument that the support obligor must carry the burden of explaining the origin of all deposits made into the obligor's account. In fact, it is clear from the language of ORS 25.290 that the legislature knew how to place the burden on the obligor to produce financial documentation when it intended the obligor to have such a burden. *See Emerald PUD v. PP&L*, 302 Or 256, 269, 729 P2d 552 (1986) ("[W]hen the legislature includes an express provision in one statute but omits such a provision in another statute, it may be inferred that such an omission was deliberate." (Internal quotation marks omitted.)).

Furthermore, mother relies solely on father's deposit history, without considering his withdrawal history as well. Based on father's ledger, his outgoing monthly expenses for his business were not much less than the average monthly deposit amount on which mother relies. Moreover, mother considered deposits going back to January 2001, long before father changed to his current job as an auto rebuilder. The best evidence of deposits that father has made since he

became an auto rebuilder are the deposits made during the August 2002 to April 2003 time period. Those deposits, while not mirroring the amount in his ledger for cars sold, do not clearly indicate that father's gross income is greater than what he has reported. Just as the trial court was troubled by the conflict in the evidence, so are we. Ultimately, however, for the reasons expressed above, we agree with the trial court that there is insufficient evidence for us to conclude that father's income is $5,100 per month, as mother, the proponent of that amount, argues.[5] We conclude that the trial court did not err in accepting father's stated income for purposes of determining his child support obligation. However, on remand, father's child support amount should nevertheless be recalculated consistent with our changes regarding father's parenting schedule.

■    Mother next assigns error to the court's refusal to require father to pay past child support from the time of child's conception in January 1992 until September 1996, when father began voluntarily paying child support. The trial court declined to award any past support, because "[s]uch an award would be based upon speculation since there was no evidence presented regarding Father's or Mother's income or expenses prior to January, 1996." On *de novo* review of the record, we perceive no reason to disagree with the trial court's reasoning.

■    Mother's final assignment of error pertains to that portion of the judgment changing child's last name to father's last name.[6] After trial, the court issued a letter with its findings regarding parenting time, child support, and past child support. After being advised by counsel that father had also requested that child's name be changed, the trial court issued a letter concluding that it was in child's best interests to change her last name to father's last name. Thereafter, mother requested that the trial court meet with child regarding the name change. Initially, the court agreed, but then

---

[5] Mother does not argue on appeal that father failed to provide documentation of his ordinary and necessary business expenses. ORS 25.290. We therefore do not consider that issue.

[6] At the time of trial, mother had remarried and changed her last name to her husband's. Child's last name remained mother's maiden name.

refused to do so, after mother asked that the meeting between the court and child be on the record. The court stated in a letter to both parties:

> "I reluctantly agreed to meet with [child] privately, but then received a letter from [mother's counsel] * * * requesting that the private meeting between [child] and myself occur in the presence of a court reporter. My judicial assistant advised counsel for [mother] * * * that the request that the meeting with [child] be on the record was denied. I did not want child to feel any compulsion in her discussions with me. I wanted those discussions to be absolutely private so that she couldn't be held accountable by either parent for expressing her personal thoughts to me.
>
> "[Mother's counsel] appeared on October 23 at the time scheduled for the private meeting and provided my assistant with a Motion for Testimony of Child. *Because of the insistence by counsel for Respondent that my discussion with [child] be reported, I simply declined to meet with [child.]*"

(Emphasis added.)

Mother argues that, once the court agreed to meet with child regarding the name change, by law it was required to meet with the child on the record, and that its refusal to do so constituted reversible error. She points to the language of ORS 107.425(7), which provides:

> "Prior to the entry of an order, the court on its own motion or on the motion of a party may take testimony from or confer with the child or children of the marriage and may exclude from the conference the parents and other persons if the court finds that such action would be likely to be in the best interests of the child or children. However, the court shall permit an attorney for each party to attend the conference and question the child, and *the conference shall be reported.*"

(Emphasis added.)

Mother agrees that, under the language of the statute, a court has discretion to confer with a child, but once the court decides to question the child, it has no discretion under the statute as to whether that conference will be reported.

Consequently, in mother's view, the trial court erred in refusing to hold a hearing with child on the record. Father argues that this assignment of error is unreviewable because mother waited until after the close of evidence to present her request that the court confer with child. He also argues that the trial court's initial decision was based on the belief that mother had "waived" the reporting requirements of ORS 107.425(7). According to husband, at that point in time, "[i]f the judge had simply denied the request, his decision clearly would have been correct."

ORS 107.425(7) states that a party may make a motion for the court to have a conference with child "prior to the entry of an order." At the time that mother made her request, the court had issued a letter containing its findings, but it had not yet entered a judgment. Consequently, mother made her motion "prior to the entry of an order," and we conclude that her assignment of error is therefore reviewable. Furthermore, we disagree with father that the trial court "understood" mother's request to "waive" the reporting requirement of ORS 107.475(7). There is no evidence in the record that mother intended to waive any requirement of that statute.

Although in the end the trial court denied the request to hold the conference altogether, it is clear from the record that it would have held the conference but for mother's insistence that the court place the conference on the record. It is also clear from the trial court's expressed concerns in the record that it believed that the reporting of the conference would harm child. Therefore, the issue as framed is whether ORS 107.425(7) allows the court to conclude, within its discretion, that a reported conference is not in the best interests of a particular child. We conclude that the statute gives the trial court that kind of discretion. Based on the language of the statute, the only type of conference that the trial court can hold is a reported conference with attorneys present. The statute provides that the trial court *may* hold that conference. Consequently, it follows that the trial court has discretion in determining whether to hold such a conference. A review of the trial court record indicates that, although child needs both parents in her life, mother and father have not always recognized the importance of the other parent in

child's life and have not always cooperated in a manner that was in child's best interests. The trial court was appropriately concerned that the child might be "held accountable" to either parent for her statements to the court; therefore, it did not abuse its discretion in denying a request for a reported conference.

■ Mother also argues that the evidence indicates that it is not in child's best interest to change her name, unless child agrees to the change. Mother points to testimony by child's therapist in which she recommended that child's name be changed only if child wanted her name changed. There is no evidence in the record regarding the child's desires on that point. On *de novo* review, we conclude that child's name should not be changed.[7]

Parenting time schedule modified: In alternate weeks, father to have parenting time from sundown on Saturday until 9:00 a.m. on following Wednesday, when father will take child to school or return her to mother; father to have overnight parenting time on alternate Tuesdays; parents to alternate parenting time every two weeks in summer; child support award vacated and remanded for recalculation; name change reversed; otherwise affirmed.

---

[7] *See Aylsworth v. Adams*, 85 Or App 382, 736 P2d 225 (1987), *rev den*, 303 Or 700 (1987) (standard for determining whether to change child's name is best interests of child).