Submitted on record and briefs December 16, 2005, provision of judgment changing child's name reversed; otherwise affirmed December 27, 2006

Chad DOHERTY,
*Respondent,*

*v.*

Christy WIZNER,
*Appellant.*

04CV083; A127262

150 P3d 456

Dale L. Smith filed the brief for appellant.

Annetta L. Spicer filed the brief for respondent.

Before Wollheim, Presiding Judge, and Haselton, Judge, and Harris, Judge pro tempore.

HARRIS, J. pro tempore.

**HARRIS, J. pro tempore**

Christy Wizner (mother) appeals a judgment in a fil-iation action filed by Chad Doherty (father) regarding a six-week-old girl in mother's custody. At issue in this appeal is that aspect of the trial court's judgment granting father's request to have the child's last name changed from mother's last name to father's last name. Mother assigns error to that disposition on the ground that the trial court applied the incorrect legal standard to the name change ruling.[1] On *de novo* review, ORS 19.415(3), we agree with mother. Accordingly, we reverse the disposition of the name change, but otherwise affirm.

## I.   BACKGROUND

A child was born to mother and father on April 8, 2004. The child's birth certificate identified the child by mother's surname. Father filed this filiation action on May 18, 2004. During the pendency of the action, mother and father were able to resolve issues concerning father's pater-nity, father's support obligation, and father's parenting time and mother's continued custody. The only remaining issue before the trial court was father's request to have the child's last name changed from mother's last name to father's last name. On November 19, 2004, the court conducted a hearing on the question of which surname the child should be given. The following facts were established at the hearing: (1) mother has had custody of the child since the child's birth; (2) the name "Wizner" is the surname of mother's former spouse; (3) mother is the custodial parent of three children with her former spouse, ages three, six, and eight at the time of the hearing; (4) the other three children also use the sur-name Wizner; (5) the parties have been following a parenting plan that allows father weekly contact with the child; and (6) father has been paying support for the child.

---

[1] Father argues that, pursuant to ORAP 5.45, mother failed to preserve the error at trial. A review of the transcript reveals that mother "clearly raise[d] the issue in closing argument" and, therefore, we do not agree that there is an issue of preservation in this case. *State v. Forrester*, 203 Or App 151, 155, 125 P3d 47 (2005).

Both parties testified. Father testified that the infant should have his last name "[b]ecause she has no blood of Wizner in her. She is my child, our child, but I just grew up that way." Mother testified that "I just think it would be a whole lot easier on the children * * * to keep the same last name."

After hearing the testimony of the parties, the court acknowledged that it was not clear what "standard" should be followed under the circumstances presented, but that it seemed prudent to follow the custom of naming a child after a parent the child is related to "by blood." The court reasoned that the child should have the name of the father (Doherty) because the mother's name (Wizner) is not a family name that the child is related to by blood, and entered judgment accordingly.

On appeal, mother asserts that the trial court did not properly apply the "best interest of the child" standard to the name change. Had it done so, mother argues, father's request would have been denied because it is in the child's best interest to have the surname of her mother and other siblings. Conversely, father contends that Oregon law requires that the trial court recognize the protected interest of the father in having the child bear his surname. We begin our discussion by briefly reviewing the historical development of surnames in America.

## II.   ORIGIN AND HISTORY OF SURNAMES IN AMERICA

Many different naming systems exist throughout the world.[2] The prevailing custom in most western Anglo-Saxon based cultures is for one or both parents to present a child with three names at birth: the first or given name,[3] a

---

[2] Most cultures outside the western world do not have a practice of using surnames. Lisa Kelly, *Divining the Deep and Inscrutable: Toward a Gender-Neutral, Child-Centered Approach to Child Name Change Proceedings*, 99 W Va L Rev 1, 7-9 (1996). Those people in other cultures who use a second name do not follow the custom generally practiced by people in this country. *Id.*; *see also* J. N. Hook, Ph.D., *Family Names: How Our Surnames Came To America* 74-320 (1982).

[3] The "given name" has also historically been referred to as the forename or Christian name. Kelly, 99 W Va L Rev at 9, drawing from Elsdon C. Smith, *The Story of Our Surnames* 1 (1970).

middle name,[4] and a last name or surname.[5] The surname for children of married parents is usually inherited from the father.[6] The practice of using surnames in America finds its roots in the traditions which developed after the Norman Conquest in 1066.[7] After the Conquest, old Saxon names were gradually replaced with a limited number of Norman names.[8] Over time, this resulted in many people using the same names.[9] This development, along with growing populations, created the need to take a second name so that individuals could be separately identified.[10]

Initially, surnames were drawn from a number of sources and were not passed down from generation to generation.[11] Over time, however, surnames became hereditary

---

[4] Middle names were not used in early colonial America. Kelly, 99 W Va L Rev at 9 n 22. The practice of giving a child a middle name has developed over time as the need to separately identify individuals has increased and as a means of connecting children with their family heritage. *Id.*

[5] The term "surname" comes from the medieval French word "surnom," which means "above or over name." Yvonne M. Cherena Pacheco, *Latino Surnames: Formal and Informal Forces in the United States Affecting the Retention and Use of the Maternal Surname,* 18 T Marshall L Rev 1 (1992). The surname was initially used to distinguish people with the same first name. *Id.*

[6] Kelly, 99 W Va L Rev at 10; *see id.* at 10 n 25 (The custom of taking the father's surname assumes that the child is born to parents in a "state-sanctioned marriage." The custom is different for children born to unmarried parents.).

[7] On October 14, 1066, the Normans from northern France defeated the Anglo-Saxon army in England at the Battle of Hastings. Thereafter, Norman customs and culture dominated all phases of English life. William Dodgson Bowman, *The Story of Surnames* (1931); *see also* H. R. Loyn, *The Norman Conquest* 171-195 (1965).

[8] *See* William F. Lanahan, *What's in a Name?: Family Surnames and Social Upheaval in Medieval England,* 65 Social Studies 218 (1974) (A review of the social forces that influenced the use of surnames.).

[9] During this time, the majority of males were given the name Robert, Richard, William, John, or Henry. For females, the choices were even more limited. Kelly, 99 W Va L Rev at 10; *see also* Richard H. Thornton, *The Controversy Over Children's Surnames: Familial Autonomy, Equal Protection and the Child's Best Interests,* 1979 Utah L Rev 303, 305; M. T. Clanchy, *England and Its Rulers: 1066-1273* 57 (1983).

[10] *See* Hook, *Family Names: How Our Surnames Came To America* at 12 (Distinctions needed to be made when two people were trying to identify a person with a common name, like John. "So qualifications were added, as in imaginary bits of conversations like these: 'A horse stepped on John's foot.' 'John from the hill?' 'No. John of the dale.' 'John the son of William?' 'No. John the son of Robert.' 'John the smith?' 'No. John the tailor.' 'John the long?' 'No. John the bald.' "); *see also* Shannon J. Kennedy-Sjodin, Note, Keegan v. Gudahl: *The Child's Surname as a New Bargaining Chip in the Game of Divorce,* 41 SD L Rev 166, 174-75 (1996).

[11] Most surnames were drawn from places (Hill), occupations (Brewer), physical descriptions (Little), moral characteristics (Good), and relationships or

and were used to facilitate the inheritance of property.[12] The custom of passing the father's surname on to the children was further developed in response to England's legal system and social practices in which the ownership and management of all marital property was vested in the husband through what came to be called the doctrine of coverture.[13] Under this doctrine, the wife's legal identity was subsumed in the husband's. The husband had all legal rights, duties, and powers with respect to the children of the marriage and the children born of the marriage were given the surname of their father. Lisa Kelly, *Divining the Deep and Inscrutable: Toward a Gender-Neutral, Child-Centered Approach to Child Name Change Proceedings*, 99 W Va L Rev 1, 19-21 (1996).

When children were born to unmarried parents, different customs were followed. This country adopted the practice developed from the English common law, which maintained that a child born to unmarried parents was a child of no one.[14] This usually meant that the state was required to take responsibility for the care and custody of those children.

---

patronyms (Williamson). Kelly, 99 W Va L Rev at 10. Initially, people in the same family would commonly have different surnames. *Id.* at 11; Pacheco, 18 T Marshall L Rev at 6.

[12] The custom of using a "hereditary paternal surname" finds its origins in the feudal land tenure and primogeniture systems imposed by the Normans. Beverly S. Seng, *Like Father, Like Child: The Rights of Parents in Their Children's Surnames*, 70 Va L Rev 1303, 1324 (1984). The practice of passing a surname on to the next generation was first used by those who owned land. *Id.* at 1325. By the fourteenth century, surnames commonly served as hereditary family names, essentially because inheritance of property was in most cases contingent upon an heir using the surname associated with family property. Thornton, 1979 Utah L Rev at 305. Eventually, surnames became hereditary among those who did not own land due principally to government edict. *Id.* at 305-06 (Henry VIII, for example, "required a record to be kept in every parish of the births, marriages, and deaths of the parish inhabitants, with legitimate births generally being recorded in the name of the father." Family members were encouraged to identify themselves with the father's surname when recording their names.).

[13] *See Gubernat v. Deremer*, 140 NJ 120, 132, 657 A2d 856, 863 (1995) ("A woman as soon as she is married, is called *covert* * * * that is, 'veiled'; as it were, clouded and overshadowed." (internal quotation marks omitted; emphasis in original)).

[14] "At common law, an illegitimate child was *filius nullius*, the son of no one, or *filius populi*, the son of the people." *D. R. S. v. R. S. H.*, 412 NE2d 1257, 1261 (Ind Ct App 1980). By custom, the child did not receive the surname of a parent but received a surname based upon factors other than lineage—usually reputation. Thornton, 1979 Utah L Rev at 312.

Governments eventually relieved themselves of their support and custody obligations by declaring that children born to unmarried parents were the children of the mother.[15] Based on this practice, the child was either given the surname of the mother or the mother was given the right to name the child. *Id.* at 34-35, 46-47; Karen Czapanskiy, *Volunteers and Draftees: The Struggle for Parental Equality*, 38 UCLA L Rev 1415, 1423-24 (1991).

This country has followed the naming customs and practices adopted from English common law and traditions until recent times. Beginning in the latter half of the twentieth century, traditional naming practices, writes one commentator, were recognized as "com[ing] into conflict with current sensitivities about children's and women's rights." Richard H. Thornton, *The Controversy Over Children's Surnames: Familial Autonomy, Equal Protection and the Child's Best Interests*, 1979 Utah L Rev 303. Those changes accelerated a shift away from the interests of the parents to a focus on the best interests of the child. The law in this area continues to evolve today mainly in the context of paternity and custody actions.[16]

## III. THE "BEST INTEREST OF THE CHILD" STANDARD

The "best interest of the child" standard has long been looked to by the courts as a guide to resolving disputes relating to children.[17] In this country, the best interest standard has historically been used in most family law cases

---

[15] Custody of the child born to unmarried parents was awarded to the mother, either by court edict or by legislation, consistent with "her duty to support him, as his natural guardian." *Secretary of Commonwealth v. City Clerk of Lowell*, 373 Mass 178, 191, 366 NE2d 717, 726 (1977); *see also Wright v. Wright*, 2 Mass 109, 110 (1806) ("In legal contemplation, [an illegitimate child] is generally considered as the relative of no one. But, to provide for his support and education, the mother has a right to the custody and control of him, and is bound to maintain him, as his natural guardian.").

[16] Joanna Grossman, *Whose Surname Should a Child Have*, FindLaw's Writ column (Aug 12, 2003), http://writ.news.findlaw.com/grossman/20030812.html (last visited Dec 7, 2006).

[17] *See* Michael Grossberg, *Governing the Hearth: Law and the Family in Nineteenth Century America* 209-10, 237-42 (1985) (The roots of this standard can be traced to the 1800s when courts began looking to the welfare of the child in initial custody disputes between parents.).

involving children, including in disputes over custody, adoption, and neglect.[18] In more recent times, this standard has been applied by the courts to disputes between parents over the name a child should use.[19] In this state, the Oregon Supreme Court first applied this standard to a naming dispute in the case of *Ouellette v. Ouellette*, 245 Or 138, 420 P2d 631 (1966), where the court concluded that "the welfare of the children" was not furthered by mother's decision to informally alter the spelling of the long-used paternal surname of the children. Subsequently, the "welfare" or "best interest" of the child standard[20] has been followed by this court in naming dispute cases involving children, starting with the case of *Gleason v. Michlitsch*, 82 Or App 688, 690 n 1, 728 P2d 965 (1986), where the court concluded that "[b]oth the statutes governing filiation actions, * * * and the statutes governing name changes, * * * suggest that [the best interest of the child standard] is the correct standard." As previously stated by this court, to change a child's name, the party requesting the change bears the burden of showing "that the change of name is in the child's best interest." *Tibbetts and Mueller*, 183 Or App 379, 390, 52 P3d 1067, 1073 (2002); *see also Aylsworth v. Adams*, 85 Or App 382, 736 P2d 225, *rev den*, 303 Or 700 (1987).

■■    Over the years, the "best interest of the child" standard has developed in this country through state courts and legislatures towards a more gender-neutral and child-centered inquiry. It is well-established law today that neither parent has a superior right in determining the child's last name.[21] The right to name a child is a privilege belonging

---

[18] Merle H. Weiner, *We Are Family: Valuing Associationalism in Disputes Over Children's Surnames*, 75 NC L Rev 1625, 1709-1714 (1997).

[19] *See, e.g.*, *In re Marriage of Schiffman*, 28 Cal 3d 640, 620 P2d 579 (1980); *D. R. S.*, 412 NE2d at 1263; *In re Application of Saxton*, 309 NW2d 298, 301 (Minn 1981); *Daves v. Nastos*, 105 Wash 2d 24, 30, 711 P2d 314, 318 (1985).

[20] In more recent times, the "welfare of the child" standard used in *Ouellette* has been referred to by courts as the "best interest of the child" standard because that is the language adopted by the state legislature over the last 25 years when referring to the statutory standard that applies in family and juvenile matters involving children (ORS chapters 107 and 109 regarding custody, parenting time, and adoption; chapters 418 and 419B involving child welfare services and child dependency proceedings).

[21] *Pizziconi v. Yarbrough*, 177 Ariz 422, 868 P2d 1005 (1994); *In re Marriage of Schiffman*, 28 Cal 3d at 645, 620 P2d at 921; *In re Marriage of McManamy*, 14 Cal

equally to both parents. Courts across this country have set aside those naming practices of the past that endorse presumptions and preferences that favor one parent over another based upon marital status,[22] gender,[23] or custodial designation,[24] because such presumptions and preferences

App 4th 607, 18 Cal Rptr 2d 216 (1993); *In re Marriage of Gulsvig*, 498 NW2d 725, 729 (Iowa 1993); *Montgomery v. Wells*, 708 NW2d 704, 708 (Iowa App 2005); *Lassiter-Geers v. Reichenbach*, 303 Md 88, 94, 492 A2d 303, 306 (1985); *In re Application of Saxton*, 309 NW2d at 302; *Cobb v. Cobb*, 844 SW2d 7, 9 (Mo Ct App 1992); *Kirksey v. Abbott*, 591 SW2d 751, 752 (Mo Ct App 1979); *In re Change of Name of Andrews*, 235 Neb 170, 174-75, 454 NW2d 488, 491 (1990); *Magiera v. Luera*, 106 Nev 775, 777, 802 P2d 6, 7 (Nev 1990); *Gubernat*, 140 NJ at 141, 657 A2d at 867; *State ex rel Spence-Chapin Services v. Tedeno*, 101 Misc 2d 485, 421 NYS2d 297 (NY Sup Ct 1979); *Bobo v. Jewell*, 38 Ohio St 3d 330, 334, 528 NE2d 180, 184-85 (1988); *Ribeiro v. Monahan*, 524 A2d 586 (RI 1987); *Keegan v. Gudahl*, 525 NW2d 695 (SD 1994); *Hamby v. Jacobson*, 769 P2d 273 (Utah Ct App 1989); *In re Wilson*, 162 Vt 281, 648 A2d 648 (1994); *Daves*, 105 Wash 2d at 31, 711 P2d at 318; *In re Harris*, 160 W Va 422, 236 SE2d 426, 430 (1977).

[22] In 1972, the United States Supreme Court found that treating fathers of nonmarital children differently from their mothers in dependency cases was a violation of the equal protection clause of the Fourteenth Amendment. *Stanley v. Illinois*, 405 US 645, 649-58, 92 S Ct 1208, 31 L Ed 2d 551 (1972); *see Roe v. Conn*, 417 F Supp 769, 782-83 (MD Ala 1976) (the equal protection clause requires that both parents be given an equal voice in the decision to name a child); *see also* Note, *Whose Interest is Controlling in the Name Change of Minors—the Father's, the Mother's or the Child's?*, 18 Ariz L Rev 725 (1976) (where the commentator reviews the gradual shift away from all distinctions based upon the marital status of the parents principally as a result of equal protection guarantees).

[23] Gender based presumptions, such as the tender years doctrine for mothers or the protected interest doctrine for fathers, in the words of the New Jersey Supreme Court, "have been replaced by an inquiry focused on the happiness and welfare of the child." *Gubernat*, 140 NJ at 139, 657 A2d at 866; *see Hamby*, 769 P2d at 277 (summarizing the decision in *In re Marriage of Schiffman* where the California Supreme Court noted that "the long-standing rule in custody disputes that the mother is the preferred custodian of young children had been abolished in order to equalize the rights of parents. Similarly, laws have been promulgated to eliminate legal distinctions between legitimate and illegitimate children."); *see also* Seng, 70 Va L Rev at 1316.

[24] Some states have adopted a rebuttable custodial presumption, which maintains that the parent with custody is presumed to act in the best interest of the child in selecting the child's name. *See, e.g., Gubernat*, 140 NJ at 144, 657 A2d at 869 ("[W]e adopt a strong presumption in favor of the surname chosen by the custodial parent."); *see also* Weiner, 75 NC L Rev at 1742-52 (where the author discusses the strengths and weaknesses of a custodial presumption). Other states, most notably California, have rejected adoption of a custodial presumption. *See In re Marriage of Schiffman*, 28 Cal 3d at 645, 620 P2d at 921 (majority opinion refused to adopt this presumption); *see also Hamby*, 769 P2d at 277 (where a Utah appellate court concluded that "we are unwilling to adopt a presumption in favor of the choice of the custodial parent, finding that the best interests of the child test can appropriately include consideration of the custodial situation of the child, as well as other relevant factors"); *Cohee v. Cohee*, 210 Neb 855, 861, 317 NW2d 381, 384 (1982) (the Nebraska Supreme Court refused to adopt a custodial parent

are not consistent with determining the best interest of the child. These outdated naming practices have been replaced with a requirement that the court determine what is in a child's best interest, avoiding any interests not supported by the evidence or founded on presumptions that favor one parent over another.

■ The inquiry, then, is to determine, from the facts given to us by the record, what is in this child's best interest. There is no definitive list of factors to consider when deciding what would be in the child's best interest; however, several jurisdictions, including Oregon, have identified factors a court should consider—when they exist and are appropriate in any given case—in the process of deciding what surname will serve the best interests of the child. These factors include the following:

1. **The identity and preference of the custodial parent.** *Tibbetts*, 183 Or App at 391; *Gleason*, 82 Or App at 691; *State ex rel Spence-Chapin Services v. Tedeno*, 101 Misc 2d 485, 489, 421 NYS2d 297, 300 (NY Sup Ct 1979); *see also* Merle H. Weiner, *We Are Family: Valuing Associationalism In Disputes Over Children's Surnames*, 75 NC L Rev 1625, 1742-52 (1997).

2. **The avoidance of embarrassment, inconvenience or confusion.** *Uri and Uri*, 108 Or App 613, 615, 816 P2d 708 (1991); *Pizziconi v. Yarbrough*, 177 Ariz 422, 425, 868 P2d 1005, 1008 (1994); *In re Marriage of Schiffman*, 28 Cal 3d at 647, 620 P2d at 923; *Hamby v. Jacobson*, 769 P2d 273, 277 (Utah Ct App 1989); *see also* Weiner, 75 NC L Rev at 1732-36.

3. **Identification of the child as being part of a distinct family unit.** *Tibbetts*, 183 Or App at 391; *Gleason*, 82 Or App at 691; *In re Marriage of Schiffman*, 28 Cal 3d at 647, 620 P2d at 923; *In re Change of Name*

---

presumption); *In re Wilson*, 162 Vt at 284, 648 A2d at 650 (the Vermont Supreme Court chose not to apply a custodial presumption).

We choose not to adopt a custodial presumption. We take this position because such a presumption is inconsistent with determining the best interest of the child after considering all the circumstances in each case. The custodial parent's preference should be considered as one factor along with all other relevant factors in determining what name would be in the child's best interest. This approach gives the court more flexibility in the process of applying the best interest standard.

*of Andrews*, 235 Neb 170, 177, 454 NW2d 488, 492 (1990); *Hamby*, 769 P2d at 280.

4. **The age of the child and the length of time the child has used the surname.** *Tibbetts*, 183 Or App at 391; *Aylsworth*, 85 Or App at 385; *In re Marriage of Schiffman*, 28 Cal 3d at 647, 620 P2d at 922; *In re Change of Name of Andrews*, 235 Neb at 177-78, 454 NW2d at 492-93; *Hamby*, 769 P2d at 279; *Daves v. Nastos*, 105 Wash 2d 24, 31, 711 P2d 314, 318 (1985).

5. **The preference of the child.** *McArthur and Paradis*, 201 Or App 530, 545, 120 P3d 904, 912 (2005); *In re Petition of Craig*, 164 Ill App 3d 1090, 1091, 518 NE2d 728, 729 (1987); *Daves*, 105 Wash 2d at 31, 711 P2d at 318; *see also* Beverly S. Seng, *Like Father, Like Child: The Rights of Parents in Their Children's Surnames*, 70 Va L Rev 1303, 1351-54 (1984).[25]

6. **The effect of a name change on the relationship between the child and each parent.** *Uri*, 108 Or App at 615; *Pizziconi*, 177 Ariz at 425, 868 P2d at 1008; *In re Marriage of Schiffman*, 28 Cal 3d at 647, 620 P2d at 922; *In re Change of Name of Andrews*, 235 Neb at 177, 454 NW2d at 492; *Hamby*, 769 P2d at 277, 279; *Daves*, 105 Wash 2d at 31, 711 P2d at 318.

7. **Parental misconduct.** *Huffman v. Fisher*, 337 Ark 58, 68, 987 SW2d 269, 274 (1999); *In re Change of Name of Andrews*, 235 Neb at 177, 454 NW2d at 492; *Keegan v. Gudahl*, 525 NW2d 695, 699 (SD 1994); *Hamby*, 769 P2d at 279. *See* Shannon J. Kennedy-Sjodin, Note, Keegan v. Gudahl: *The Child's Surname as a New Bargaining Chip in the Game of Divorce,* 41 SD L Rev 166, 188 (1996) (where parental misconduct is distinguished from marital misconduct).

8. **The level of support for and contact with the child.** *Aylsworth*, 85 Or App at 385; *Statham v. Domyan*, 153 Ill App 3d 1003, 1007, 506 NE2d 613, 616 (1987); *In re Marriage of Gulsvig*, 498 NW2d 725, 729 (Iowa 1993); *Keegan*, 525 NW2d at 699.

---

[25] ORS 33.430(3) acknowledges the importance of considering the child's preference regarding a proposed name change.

9. **The motivation of the parent seeking the name change or the parent seeking to oppose it.** *Marriage of Presson*, 102 Ill 2d 303, 465 NE2d 85 (1984); *Aitkin v. Girard*, 390 NW2d 906, 910 (Minn Ct App 1986); *In re Grimes*, 530 Pa 388, 394-95, 609 A2d 158, 161-62 (1992); *see also* Weiner, 75 NC L Rev at 1729-32.

10. **The community reputation associated with the names at issue.** *D. R. S. v. R. S. H.*, 412 NE2d 1257, 1263 (Ind Ct App 1980); *In re Application of Saxton*, 309 NW2d 298, 301 (Minn 1981); *Hamby*, 769 P2d at 279; *Daves*, 105 Wash 2d 24, 711 P2d 314.

11. **Assurances of the custodial parent that she or he will not change hers or his own surname or the child's surname.** *In re Marriage of Gulsvig*, 498 NW2d at 730; *In re Stollings*, 65 Ohio App 3d 183, 188, 583 NE2d 367, 370-71 (1989); *Hamby*, 769 P2d at 280.

12. **Important ties to family heritage, ethnic identity, and cultural values.** *O'Brien v. Tilson*, 523 F Supp 494 (EDNC 1981); *In re Robinson*, 74 Misc 2d 63, 65, 344 NYS2d 147, 149 (NY Civ Ct 1972); *In re Baldini*, 17 Misc 2d 195, 195, 183 NYS2d 416, 417 (NY City Ct 1959); *see* Thornton, 1979 Utah L Rev at 304.

■ The factors listed above represent those factors most commonly identified by courts when deciding if a proposed name change is in the child's best interest; there certainly may be other factors relevant to this inquiry. Father urges us here to consider as "one factor" the father's presumed right or "protected interest" in having the child take his surname. Father asserts that he has a legal right to require that the child use his surname, unless mother can establish that it would not be in the child's best interest to give the child his name due to father's misconduct.[26]

In support of his argument, father relies on *Ouellette*. That reliance is misplaced for two reasons. First,

---

[26] *See* Cynthia Blevins Doll, Note, *Harmonizing Filial and Parental Rights in Names: Progress, Pitfalls, and Constitutional Problems*, 35 How LJ 227, 233 (1992) (The "protected interest" doctrine provides that the father of a child has a protectible interest or presumed right in having the child bear his surname, even though the mother has been awarded custody of the child. Further, under this doctrine, "the only time a father could 'forfeit' his right to perpetuate his surname was through some misconduct towards the child, such as willful abandonment."); *see also* 53 ALR 2d 914 (1957).

although *Ouellette* referred to a father's "protectible interest" in the course of quoting from an ALR annotation, 245 Or at 142, the court did not expressly adopt the "protectible interest" doctrine. Rather, the court's holding emphasizes the fact that the mother offered no evidence that the children's continued use of the father's surname is *"contrary to the welfare of the children." Id.* (emphasis added). The *Ouellette* case involved parents who were married in 1950 and divorced in 1958. The mother was awarded custody of the three children born during the marriage. After the divorce, the mother and the children continued to use the father's surname until the mid-1960s, when the mother informally changed the surname she used for herself and the children from Ouellette to O'Let. At the time the suit was filed, the children were ages 14, 13, and 9. The name the mother was trying to replace the children's surname with was not another family name but was a different spelling of the surname used by the children. On those facts, the *Ouellette* court concluded that "the welfare of the children" was not furthered by the mother's decision to informally alter the children's long-used surname. The welfare of the child, as it always does in cases of this nature, remained paramount.[27]

Second, we decline to read *Ouellette* as adopting a "paternal presumption" given the broader statutory context in which that case was decided. ORS 109.030 provides now, as it did at the time *Ouellette* was decided, that "[t]*he rights and responsibilities of the parents, in the absence of misconduct, are equal,* and the mother is as fully entitled to the custody and control of the children and their earnings as the father."[28] (Emphasis added.) In the absence of explicit language adopting a preference in favor of the father, and considering the existence of a statute that appears to abrogate such preferences, we decline to read *Ouellette* as granting superior naming rights to the father.

---

[27] Nothing in *Ouellette* suggests that, had a name change been in the best interest of the children, a "paternal presumption" would have somehow defeated the change.

[28] *See also Bryant v. Dukehart,* 106 Or 359, 370-71, 210 P 454 (1922) ("In this state the common-law rule, that the rights of the father to the custody and control of the minor children are superior to those of the mother, is abrogated by statute. * * * [T]he rights of the parents to the custody and control of the minor children of the marriage are equal.").

Father's insistence that we recognize a paternal preference or presumption ignores a half-century of social change and development of the law in our country. Since the 1960s, we have witnessed significant changes in the form and function of the traditional family unit. During this time, the marriage rate has sharply declined, while the cohabitation and divorce rates have significantly increased.[29] And of particular relevance to this case, the percentage of children born to unmarried parents has increased from 5 percent in 1960 to 37 percent in 2005.[30] These changes have reshaped traditional customs and patterns regarding family and the rearing of children, including the custom of naming our children. In recognition of these changes, we have adhered to an analysis based solely on the best interest of the child standard—as articulated in *Gleason* and, thereafter, in the cases that followed.[31] The gender-based presumptions of the past should not apply to this analysis because they take discretion away from the court to consider the circumstances unique to each case and to apply those factors relevant to a determination of what would be in the child's best interest. Application of the paternal presumption, in effect, defeats the "best interest of the child" standard. For this important reason, along with those discussed herein, we hold that the best interest of the

[29] Between 1970 and 1998, the number of marriages per 1,000 people per year in the United States declined from 10.6 to 8.3. US Census Bureau, *Statistical Abstract of the United States: 2001* 87; table No. 117, http://www.census.gov/prod/2002pubs/01statab/vitstat.pdf; The National Marriage Project, *The State of Our Unions, 2003: The Social Health of Marriage in America*, http://marriage.rutgers.edu/Publications/SOOU/SOOU2003.pdf. Since 1960, there has been an approximate 1,000 percent increase in unmarried couples living together. US Census Bureau, *Unmarried-Couple Households, by Presence of Children: 1960 to Present* (2006), http://www.census.gov/populations/socdemo/hh-fam/uc1.pdf. Since 1996, experts projected that one-half of the women then living in the United States would dissolve a marriage during their lifetime. Rose M. Kreider and Jason M. Fields, US Census Bureau, *Number, Timing, and Duration of Marriages and Divorces: 1996* (2002), http://www.census.gov/prod/2002pubs/p70-80.pdf.

[30] Brady E. Hamilton, Joyce A. Martin, and Stephanie J. Ventura, National Center for Health Statistics, *Births: Preliminary Data for 2005* (Nov 21, 2006), Table 3, http://www.cdc.gov/nchs/data/hestat/prelimbirths05_tables.pdf#3. Stephanie J. Ventura, National Vital Statistics Reports, Vol 48, No 16 (Oct 18, 2000) *Nonmarital Childbearing in the United States, 1940-99,* Table 1, http://www.cdc.gov/nchs/data/nvsr/nvsr48/nvs48_16.pdf.

[31] *Tibbetts*, 183 Or App 379; *Aylsworth*, 85 Or App 382; *McArthur*, 201 Or App at 545.

child standard should be applied in this case, free of any presumptions or preferences.

## IV. ANALYSIS

■     Assessing the factors relevant to this case, we first note that mother is the custodial parent and will be the primary caregiver in the child's life into the foreseeable future. The court in *Gleason* concluded that "the identity of the custodial parent is an important factor in determining the relationship of the child's best interests to the surname it should bear." 82 Or App at 691. As observed by the court in *Tibbetts*, it is especially important to consider if the child's name "would be different from his primary custodial parent's name." 183 Or App at 391. In both *Gleason* and *Tibbetts,* the court quoted with approval this statement of policy from a New York trial court:

> " 'The significant consideration is that the mother has custody and it is she who will be the primary caretaking figure and who will make the major decisions for [the child]. Moreover, the court recognizes that children, as they grow older, generally prefer to use the name of the parent with whom they live.' "

*Gleason,* 82 Or App at 691 (quoting *State ex rel Spence-Chapin Services,* 101 Misc 2d at 489, 421 NYS2d at 300); *Tibbetts,* 183 Or App at 391. Consideration of the identity and desire of the custodial parent is an important factor in the process of addressing a request for a name change. In this case, mother gave the child her surname at birth. She explained to the court that she gave the child her surname because it was the same surname that she and her three other children used and that "I just think it would be a whole lot easier on the children * * * to keep the same last name." Mother's decision to give the child her surname is rationally based and appears to have been made in furtherance of the child's best interest.

     Second, it is foreseeable that giving the child her father's surname may lead to some confusion and possible embarrassment to the child at those times when the child is identified as having a different surname from the surname used by her mother and three siblings. This might occur at school and in other social settings, where the child would

have to explain why she has a name different from her mother and siblings.[32]

Third, we consider the fact that the child is presently part of a distinct family unit, with mother and her three siblings. The surname they use is the surname all three of the child's siblings have used since their birth; it is the surname used by the father and mother of the child's siblings. This surname serves as a symbolic connector and foundation for this family unit.[33] As time goes on, the child may be better able to identify herself as belonging to this distinct family unit if her surname is the same as her mother and three siblings.[34] As other courts have acknowledged, a child's use of the same surname as used by the custodial parent and others living in the household may promote in the child feelings of acceptance and security.[35]

Fourth, because of the child's young age (seven months at the time of trial), she is not capable of identifying with any given surname or indicating a reasonable preference for one name over another.[36] Accordingly, those otherwise important considerations offer no guidance in this case.

---

[32] *See* Weiner, 75 NC L Rev at 1734-35; *see also Aitkin*, 390 NW2d at 909; *Magiera*, 106 Nev at 778, 802 P2d at 8 (The court found that the child born to unmarried parents may experience "confusion about her identity, difficulties in school and society, and embarrassment among friends" if she was required to use a name different from her custodial mother.); Harold H. Bloomfield, *Making Peace for Your Stepfamily* 75 (1993) (Children in blended families who keep the noncustodial father's name "often feel embarrassed, particularly at school * * * where the difference becomes conspicuous. The child suddenly finds himself or herself having to explain why he or she has a different name than his or her own mother.").

[33] We are not addressing here the common modern occurrence of children being given the surname of one parent when the parents, though living together, choose to maintain different surnames.

[34] As we have stated before, "children, as they grow older, generally prefer to use the name of the parent with whom they live." *Tibbetts*, 183 Or App at 391 (quoting *State ex rel Spence-Chapin Services*, 101 Misc 2d at 489, 421 NYS2d at 300).

[35] *See Doe v. Dunning*, 87 Wash 2d 50, 54, 549 P2d 1, 3 (1976) (The function and use of a surname to identify children as being part of a distinct social and economic unit is not served by giving father's surname to a child who does not live in father's household.).

[36] *See In re Change of Name of Andrews*, 235 Neb at 171-72, 178, 454 NW2d at 489 (The children in this case were 25-month-old twins at the time of trial. The court relied on expert testimony in the record in concluding that two-year-old children "are too young to identify with a specific surname."); *Hamby*, 769 P2d at 279 (This case involved children aged 28 months and 6 months. The appellate court did not disturb the trial court's finding that the children were "too young to be accustomed to the surname" they had been using.); *In re Marriage of Schiffman*, 28 Cal

Fifth, we recognize that having a surname different from the noncustodial father's surname can have an impact on the relationship that the noncustodial parent has with the child. Historically, many courts would require children to take the noncustodial father's surname as a means of maintaining a connection between father and child. We recognize that, in many cases, a noncustodial parent does not have the same opportunities, as the custodial parent does, to strengthen an existing bond with the child. Nevertheless, a noncustodial father's insistence that the child bear his name can, in the words of one commentator, confuse "the child's best interests with the father's need for a symbol * * *. The analysis would be clearer if courts recognized that the father's feelings are not equivalent to the child's interests." Seng, 70 Va L Rev at 1339-40. In the final analysis, development of a bond between father and daughter will depend on the love and devotion that father exhibits toward his daughter, not on whether the child bears his name.[37]

Sixth, there is no evidence in the record that mother has any plan to change the surnames of her children, either through marriage or otherwise. It is reasonable to assume that all four children of mother will share this surname into the foreseeable future.

Finally, we consider the father's expressed reason for seeking this name change. Father asserts that his surname is a name the child is related to "by blood," while the

---

3d at 647, 620 P2d at 922 (The court observed that "the length of time that the child has used the surname is to be considered. If, as here, the time is negligible because the child is very young, other facts may be controlling.").

[37] See In re Marriage of McManamy, 14 Cal App 4th at 611, 18 Cal Rptr 2d 218 (the child's understanding of the role of her father in her life "will not be based solely on her surname, but will develop in light of his conduct and attitudes, particularly his active involvement in her life"); see also Gubernat, 140 NJ at 147, 657 A2d at 870 ("The love of the parent, and not the name of the parent, is the 'cohesive that binds parent and child and, further, gives unique strength and durability to the natural loyalty that the parent holds for the child.'" (quoting M. H. B. v. H. T. B., 100 NJ 567, 574, 498 A2d 775 (1985))).

The record in this case reflects the fact that father has supported his daughter and has shown an interest in maintaining a relationship with her. Father filed this action within six weeks of the child's birth, he has maintained regular contact with the child, and he has paid child support. These facts show that father is very interested in establishing and maintaining a strong bond with his daughter. The surname the child uses is incidental to this process.

child has no ancestral family relation to mother's surname. In our country, a name has commonly served as a link to a person's family heritage and ethnic identity.[38] As one court stated, "[p]ride of ancestry, parentage and succession is deeply rooted in our society." *In re Robinson*, 74 Misc 2d at 65, 344 NYS2d at 149. Positive benefits can accrue to a child from a knowledge and awareness of the people and cultures the child is related to. However, if the unstated goal of father in giving his name to his daughter is to develop in her an awareness of her roots and family heritage, requiring that she use her father's surname does not, by itself, accomplish this important goal. Passing on a surname, by itself, only identifies a child as being connected to a limited number of ancestors,[39] unless the name can be connected to a history, a culture, a family heritage, or an ethnic identity that can give added meaning and a sense of belonging to a child's life. There is no evidence in the record that father has made, or plans to make, that connection.[40]

The most important and relevant factors from this analysis are, first, the reasonable preference of the custodial

---

[38] *See* Catherine A. Ritterbusch, Comment, *In the Name of the Father: Wisconsin's Antiquated Approach to Child Name Changes in Post-Divorce and Paternity Proceedings,* 83 Marq L Rev 279, 281 (1999) ("A child's name often represents his or her family identity; surnames can reflect cultural, ethnic, religious, familial or other societal and personal values."); *see also* Laura Anne Foggar, *Parents' Selection of Children's Surnames*, 51 Geo Wash L Rev 583, 587 (1983) ("Names and naming practices originate in the languages and cultures of the varied heritages of America's citizenry.").

[39] In fact, use of a father's surname alone will connect the child only to those ancestors who have used that surname, which is less than one-half of one percent of a person's direct relatives. One scholar offers this analysis: "Suppose the last name you were given at birth happened to be around ten generations ago * * *. If you went back to the tenth generation preceding your birth, you would have 1,024 great-great-great-great-great-great-great-great-grandparents. Only one * * * among that gang of 1,024 would bear the patronym [paternal surname] that was passed on to you. If you were to add up all your direct ancestors * * * back to that tenth generation, you would come up with 2,046 people. Of those 2,046 people, only ten of them bore (and passed on) this patronym." Weiner, 75 NC L Rev at 1658 (quoting Sharon Lebell, *Naming Ourselves, Naming Our Children: Resolving The Last Name Dilemma* 19-20 (1988)).

[40] And even if father had been successful in making that connection, it must be acknowledged here that father's hope of informing this child of his family history through use of his surname ignores the mother's family history. The custom of children using the father's surname has for centuries disregarded, in the words of one commentator, "a mother's pride in her own ancestry and her desire to have her children perpetuate her name." Seng, 70 Va L Rev at 1329.

parent, and, second, the importance of avoiding any confusion or embarrassment that could result from the child using a surname different from that used by her custodial parent and three siblings. We conclude on *de novo* review that these considerations, when combined, establish that it is in the best interest of the child that her surname remain Wizner. Therefore, the decision of the trial court to change the child's surname from Wizner to Doherty is reversed.

Provision of judgment changing child's name reversed; otherwise affirmed.