Argued and submitted March 9, affirmed August 3, 1981

In the Matter of the Marriage of

MORTON,
*Appellant,*
*and*
MORTON, nka Ervin,
*Respondent.*

(No. 14,686-E, CA 19188)

632 P2d 1

Max S. Taggart, II, Ontario, argued the cause for appellant. With him on the brief was Taggart & Taggart, Ontario.

D. S. Denning, Jr., Ontario, argued the cause and filed the brief for respondent.

Before Richardson, Presiding Judge, Joseph, Chief Judge, and Thornton, Judge.

JOSEPH, C. J.

## JOSEPH, C. J.

Father appeals from the trial court's refusal to award him custody of two minor children. He contends that mother's wilful refusal to abide by the terms of a visitation order was designed to alienate the children from him and that that, together with the fact of his remarriage and establishment of a new home, constitutes a sufficient change of circumstances to justify a change of custody. We affirm.

The original decree in November, 1977, awarded custody of the parties' two minor children, boys seven and four years old respectively, to mother. With respect to visitation, it provided only that father "shall have the right to visit said children at all reasonable times and places." In June, 1979, on father's motion, the court modified the decree by substituting a specific visitation schedule for the quoted language. Father was given visitation one weekend per month for the then current year, increasing to two weekends per month thereafter, various holidays, birthdays and several consecutive weeks during the summer.

This appeal arises from a subsequent show cause proceeding instituted by father. He asked that mother be held in contempt for wilful violation of the visitation order and that he be awarded custody of the children. By a counter-motion, mother requested that father's child support obligation and his visitation rights be terminated. The trial court found mother "absolutely in contempt" for failing to abide by the terms of the visitation provisions; a sentence of 60 days was suspended on condition that mother comply with the visitation terms. The other motions were denied.

The recitation of the above events reveals that for more than three years the parties have failed to reach an amicable agreement regarding father's visitation. Father's testimony showed that mother has become increasingly uncooperative. At the time of the dissolution, the parties agreed that father would have at least one weekend per month with the boys, and he encountered no difficulty in arranging to see the boys until December, 1978.[1] After

---

[1] There was apparently a six-month period immediately preceding October, 1978, when father did not attempt to exercise any visitation rights.

repeated frustrated attempts to see them in 1979, he filed the motion to fix specific visitation dates. Mother complied with the terms of the amended decree for nearly six months, but since January, 1980, despite father's repeated efforts to see the boys under the fixed visitation schedule, she has denied him virtually all visits with them.[2] From then until the time of the hearing on September 11, 1980, he was allowed visitation only on Father's Day.

Mother testified that the initial difficulty with arranging visitation was due to father's last minute requests for visits and that her latest refusal of visitation was, in essence, for the protection of the boys. She testified that the boys despise their father and that they cried and became "hysterical" and sometimes refused to eat in the prospect of visiting him. She said that one boy was considerably more upset than the other, was afraid his father would kill him and had told her stories of his father's unexplained violence against him. She testified that in December, 1979, out of her concern for the boys' emotional problems, she had had psychiatric evaluations done on them. According to mother, the psychiatrist advised that "for the betterment of the boys' mental well-being and also their physical well-being, that visitation should be stopped."[3] She followed that "advice."

---

[2] One witness, who accompanied father on his attempts to visit the children, testified:

> "* * * Ninety percent of the time they wouldn't be home.
>
> "* * * * *
>
> "She'd give 'em a bunch of noise and wouldn't let him have 'em. One time there was a statement in there and she and her husband, present husband, would stand at the door and told him he couldn't have 'em. She had full custody and she wasn't going to give 'em to him no matter what the Judge said. * * * Another time they told him to don't bother come back and waste your gas because you're not getting the kids."

[3] The psychiatrist's evaluation, written September 9, 1980, stated:

> "It is the impression of this examiner that the Morton children are currently residing in the home that is best suited to their emotional and physical well-being. The Ervin household is seen by the boys as being the more nurturant of the two homes, and is particularly seen by Carl as his psychologically intact family. The Morton boys see Mr. Morton as a frightening figure who does not have their physical and emotional well being foremost in his mind. To place the boys with Mr. Morton would not be in their best interest. Fathers perceived as such by their sons can have an extremely negative effect on the sons' development of self esteem. The best way for such

Father's witnesses testified that he is an affectionate father whose physical discipline consists of an occasional spank with the hand. They said that the boys seemed happy on visits with father and got along well with his new wife and her two children.

We are faced with a situation where the children may have come to distrust and dislike their non-custodial father.[4] Although our review of the record does not convince us that mother has acted with a conscious design to

---

a relationship to improve is that *visitation be brief.* For some reason these individuals are able to be appropriate *[sic]* for short period of time, so the sons avoid the damaging effects of longer periods of association. Duane is especially in need of a supportive, stable environment and probably even psychotherapy to deal with his feelings about Mr. Morton.

"It is the recommendation of this examiner that the Morton children continue to reside with their mother and step-father, Mr. and Mrs. Allan Ervin and that visitation with Mr. Morton be *limited* until he can respond more appropriately." (Emphasis supplied.)

[4] The following colloquy took place in the judge's chambers:

"THE COURT: How often do you think you ought to go see your father? [C, the younger boy], what do you think?

"[C]: About every week.

"THE COURT: Do you think if you boys lived with your father instead of your mother that you would get along with her better?

"[D, the older boy]: Hm-hmm. (Indicating no.)

"THE COURT: Why not?

"[D]: Well, he don't really care for me. Because on my birthday, he called me up and he goes, 'Happy birthday, [D],' and I go, 'Well, finally he called' and it was about five days after, and he goes, 'How's [C], can I talk to him?' And I go, 'Well, yeah, he's right here.' And then he hung up and I don't know what for.

"THE COURT: Why do you think he doesn't like you?

"[D]: I don't know.

"THE COURT: When did you first think that he didn't like you? Do you remember?

"[D]: Yeah, but not quite.

"THE COURT: What's the first thing that you remember that made you think your dad didn't like you?

"[D]: Well, I think it was about — he didn't want to have anything to do with us after the divorce and then about a year — no, not a year but maybe about six months later he called and I answered the phone and he goes, 'Hi [D], how you doing?' I go, 'Oh, fine.' And then he goes, 'Can I talk to [C]?' And I

cause that,[5] it is clear, at the very least, that she has done nothing to discourage those feelings.[6] Indeed, mother believes they are justified. However, the trial court did not:

"As far as Mrs. Ervin's story of brutality and one thing or another on behalf of the father, I find that story absolutely incredible and unbelievable. Viewing the parties on the stand and the witnesses that I've seen here in the Courtroom, I simply cannot believe that Mr. Morton has intentionally or otherwise mistreated these boys to the extent that you indicate, Mrs. Ervin, it doesn't make any sense."

---

go, 'Yeah, he's right here.' And I handed him the phone and then he talked for about thirty minutes and then [C] goes, — and then he goes, 'Bye,' and then he hung up and [C] goes like that, and I go, 'What's the matter?' And he goes, 'Oh, he hung up on me,' and I go, 'Oh, that's normal.' And that's about the last we heard of him for about six months.

"THE COURT: [C], do you think your dad likes you?

"[C]: Yeah.

"THE COURT: Do you like your dad?

"[C]: No.

"THE COURT: Huh?

"[C]: No.

"THE COURT: Why not?

"[C]: Well, he treats [D] mean and sometimes he treats me mean.

"THE COURT: What does he do to you, son?

"[C]: What?

"THE COURT: What's he do to you?

"[C]: Well, sometimes he slaps me across the face. When [D] was kind of up in the sagebrush and we were shooting birds, and I asked him if me and Shane could go up there and go with him and he slapped me on the face.

"THE COURT: Just without any reason at all?

"[C]: Hm-hmm. (Indicating no.)

"* * * * *"

[5] One witness testified that sometime after the parties' divorce and before mother's remarriage, mother said she was not going to allow father to see the kids — that "she felt that that was a way of getting back with Mr. Morton." Viewing the record as a whole, we do not find this testimony dispositive on the question of mother's motives.

[6] Mother testified that when the boys became "hysterical,"

"I talked to them and I told them that [they] had to go see them, there was nothing I could do about it. It was just the way it had to be done. And I think at that time they became resentful to me because I was forcing them to go."

Nevertheless, the trial court did not doubt mother's concern for the welfare of her children.[7] Because of the trial judge's opportunity to see and hear the witnesses, we accord substantial weight to his comments. *McCoy and McCoy,* 28 Or App 919, 562 P2d 207 (1977).

Despite mother's probable distortion of father's treatment of the children, we do not believe a change of custody is warranted in this case now. Although it is important that estranged parents "do nothing to intentionally interfere with the bonds of love and affection the child may develop for each parent," *Birge and Birge,* 34 Or App 581, 579 P2d 297 (1978), we are not convinced that we are faced with that situation here[8] or that such interference alone would be justification for a change of custody.[9] *See also, Hansen and Hansen,* 48 Or App 193, 616 P2d 567 (1980). While father has demonstrated that he and his new wife can provide a good home for the boys, he has not shown a substantial change of circumstances to warrant changing custody. Since the time of the original decree, both parties have remarried. The record shows that both parties have a great deal of love and affection for the children and are substantially equal in fitness and ability to care for them. "The change in circumstances must be quite real if the benefits from a change are to overcome the damage done to a child who is exposed to shifting parental figures." *Mackey v. Mackey,* 9 Or App 113, 496 P2d 21 (1972).

We recognize that a healthy relationship between a child of divorced parents and each parent is desirable, but a

---

[7] The court stated:

"* * * I am sure that in your mind you have love for these children and maybe in some distorted way you think you are doing the best for them."

[8] The trial court seemed to equivocate on the cause of the boys' alienation. Although he stated that the boys "parrot the story that their mother tells," he was unsure whether one boy's resentment was attributable solely to his mother:

"There is some indication that he feels that in some way he is slighted and why that is, whether it's his mother that has given him that idea or something that you [Mr. Morton] inadvertently have done over the years, I don't know."

[9] The question of whether the interference is intentional or inadvertent should have significance only insofar as it reflects the parent's ability to care for the child. A custody decision has to be made in the best interests of the child and not in order to punish a parent for improper motives.

weightier consideration in a custody decision is the "psychological impact which frequently results from the shifting of the child once it has found roots of security and stability with one of its parents." *Greisamer and Greisamer,* 276 Or 397, 402, 555 P2d 28 (1976). Speculation that the trial court's sanction of contempt will be ineffective against mother's interference with the father-son relationship, despite mother's protestations to the contrary, does not justify a disruption of either of the children's current family lives. Changing their custody is not likely to ameliorate their parents' efforts to use the children as weapons against one another. Only the parents can do that by changing their attitudes.

Affirmed. No costs to either party.