Argued and submitted November 3, 2011, affirmed March 7, 2012

In the Matter of the Marriage of

Annette M. KIRKPATRICK,
fka Annette M. Greiner,
nka Annette M. Greiner,
*Petitioner-Appellant,*
*and*

David S. KIRKPATRICK,
*Respondent-Respondent.*

Sherman County Circuit Court
070002DR; A147038

273 P3d 361

Beth A. Allen argued the cause and filed the briefs for appellant.

Margaret H. Leek Leiberan argued the cause and filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

## HADLOCK, J.

Mother appeals a supplemental judgment that changed custody of the parties' three sons from mother to father. Mother first argues that father failed to prove a change in circumstances that was substantial enough to warrant a change in custody. In the alternative, she argues that the trial court erred in concluding that a change of custody was in the children's best interests. As explained below, we conclude, consistent with the trial court's ultimate ruling, that (1) the evidence was legally sufficient to establish a substantial change in circumstances related to mother's ability to properly care for the children, and (2) the trial court did not err in determining that a change in custody was in the children's best interests. Accordingly, we affirm.

We state the facts consistently with the trial court's express and implied findings, supplemented with uncontroverted information from the record.[1] Mother and father married in 1998 and had three sons: W, born in 1998; Z, born in 2000; and T, born in 2004. Mother and father separated in the spring of 2006 and a dissolution judgment was entered in 2008.

After the 2006 separation, mother and the children left the marital home in Wasco, Oregon, to live in Sherwood, Oregon. Father, meanwhile, moved from Wasco to nearby Rufus, which is approximately 160 miles from Sherwood. The parents informally agreed to meet every other weekend in Cascade Locks, roughly halfway between the parents' homes, so father could pick up and spend time with the children.

---

[1] Under ORS 19.415(3) and ORAP 5.40(8)(c), we exercise our discretion to review equitable matters *de novo* only in "exceptional cases." Here, mother requests that we review a single aspect of the trial court's decision *de novo*. For the reasons discussed later in this opinion, we reject mother's argument on that point as unpreserved, and we disagree with her contention that the trial court plainly erred in making the single determination on which she seeks *de novo* review. Given the "presumption against the exercise of discretion" to engage in *de novo* review, ORAP 5.40(8)(c), we choose not to engage in such review here. Accordingly, we are bound by the trial court's factual findings if they are supported by any evidence in the record, and we review the court's legal conclusions for errors of law. *Porter and Griffin*, 245 Or App 178, 182-83, 262 P3d 1169 (2011); *State v. B. B.*, 240 Or App 75, 77, 245 P3d 697 (2010).

Mother periodically denied or threatened to deny father that agreed-upon parenting time. On one occasion, mother informed father by e-mail that she was going to deny his parenting time, but provided no explanation; on other occasions, mother threatened by e-mail to cancel his visits with the children. Mother denied father a scheduled visit over Thanksgiving weekend in 2007, and once denied father a make-up weekend after she had kept the children because they were ill. When exchanges of the children in Cascade Locks did occur, communication between the parents was either nonexistent or highly confrontational. Once, the parents had a "heated disagreement" over money in a Safeway parking lot while the children waited in the car; mother then left with the children so father could not see them that weekend. In February 2008, soon after the parents had filed for dissolution, the trial court issued an order specifying that father was to have parenting time every other weekend, but mother allegedly violated that order at least twice.

The trial court first ruled on custody when it entered the September 2008 dissolution judgment, following a three-day trial. Although father had sought custody of the children, arguing that mother had demonstrated an unwillingness to foster his relationship with them, the court awarded custody to mother. The court found both mother and father to be fit parents, but expressed concern that neither parent was very good at facilitating or encouraging a close and continuing relationship between the other parent and the children. Ultimately, the court granted mother custody based primarily on the undisputed fact that she had been the children's primary caretaker throughout their lives.

Conflicts over parenting time persisted and, in July 2009, father filed his first of several motions to find mother in contempt of the custody agreement. Father alleged that mother had caused him to miss a weekend visit in January 2009 and had denied him visitation over Z's birthday weekend that March. In addition, father alleged, mother had threatened to deny him 60 days of uninterrupted summer parenting time—to which he was entitled under the parenting plan—by claiming that father had failed to timely inform her of his proposed summer schedule, despite evidence to the contrary. Upon hearing the motion, the court decided to not

find mother in contempt, but acknowledged that "it's pretty clear that [father] missed some visits that he shouldn't have, and it's a little hard for me to put a number on that." The court ultimately awarded father three days of make-up parenting time, primarily for the missed January and March visits. Mother subsequently admitted that she never allowed father to exercise those make-up parenting days.

Less than two months later, mother moved to reduce father's summer parenting time from 60 days to three weeks, to coincide with when father could take vacation time from work, and she requested a provision that would have required father to allow the boys to take part in "special events" that might come up during his parenting time.[2] Father counterclaimed that mother had willfully violated the dissolution judgment three times since the hearing in July 2009. Hearings on those claims occurred on multiple dates between February and August of 2010. During that time, father filed two additional motions to find mother in contempt and a motion to change custody, all based on denials of parenting time. All motions were consolidated into the original modification proceedings, and it is the judgment that resulted from those hearings that mother now appeals.

In relating the evidence presented at the hearings on those various motions, we focus on the events that the trial court found significant to its conclusion that a change in circumstances warranted a change in custody. The first of those events occurred at the end of the summer of 2009. According to the parents' parenting-time schedule, mother was to have the children for two weeks in early August and then return them to father on August 23, for father to exercise the last 14 days of his summer parenting time. Four days before mother was scheduled to return the children to father, however, T suffered a broken arm that required surgery. Mother testified that she repeatedly attempted to call father on the night

---

[2] Mother's motion apparently was prompted by father's decision, shortly after the July contempt hearing, not to allow W and Z to participate in their baseball team's district finals game. Because W and Z's team had only 13 members, their absence meant that the team had to forfeit that game. Father, who had been exercising his summer parenting at the time, apparently was working during the relevant game and had left the boys with a childcare provider. The parties disputed whether mother had made any offer to take the boys to the game in father's stead.

of T's injury. Father testified, however, that he did not receive a voicemail about T's injury until two days later; he also said that he first learned the extent of the injury from an e-mail that mother sent the day before the children were to have been returned to father's care. Mother also mentioned in that e-mail, for the first time, that W had been seeing a sports medicine/physical therapist for a twisted knee, and that, because of the boys' medical needs, mother would keep the children for the rest of the summer. Thus, father was deprived of any opportunity to take part in the medical care of T or W, and he ultimately missed 14 days of scheduled summer parenting time.

Over Christmas of 2009, mother again denied father his regularly scheduled parenting time, this time by filing a false report of sexual abuse with the Department of Human Services (DHS). Ten months earlier, mother had called the DHS hotline to report that the boys had made comments suggesting they might have been sexually abused by the nine-year-old son of father's then fiancée. DHS did not assign a caseworker or otherwise investigate mother's allegations at that time. Regardless, mother e-mailed father, accusing the nine-year-old of "humping [the children] and kissing them" and stating that if that behavior did not stop, the children would not be allowed to visit father when his fiancée's son was present. Father replied that mother's "accusations of sexual behavior [were] ludicrous," and mother apparently did not pursue her allegations during the next 10 months.

In mid-December 2009, however, mother again sent father an e-mail alleging that his fiancée's son had sexually abused the children and, when father did not respond, mother again contacted DHS. Soon afterward, Julie Nehl, the DHS worker assigned to investigate mother's allegations, interviewed W, Z, and T. DHS closed the case as unfounded based on that interview and, on December 24, Nehl left a voicemail message for mother to that effect. Despite Nehl's voicemail, and although Nehl never had advised mother that it would be unsafe for the children to be in father's care, mother sent father an e-mail later on December 24 stating that "per an open investigation with DHS Child Welfare, and the safety and welfare of the boys, they will be staying home [for Christmas]. They have the right to be safe from any

abuse." Mother thereby denied father his Christmas visitation with the children; father filed his motion to modify custody soon after that incident.

Mother continued to hinder father's exercise of parenting time after Christmas. In March 2010, mother denied father—for the second year in a row—the parenting time that he had scheduled to celebrate Z's birthday. Soon after, mother repeatedly threatened to take the boys "[f]ar enough away where you'll never see the boys again," unless father dropped all legal proceedings and agreed to her new proposed parenting plan, which would have significantly limited father's parenting time. Mother also said that if father did not agree to her proposed parenting plan, she would tell his employer that he had stolen tools—an accusation that would have been false. Mother did not follow through on those threats.

After being presented with the evidence outlined above, the court ruled, in June 2010, that mother's interference with father's parenting time since the custody decree constituted a substantial change in circumstances that could justify modifying custody. The court also noted that mother's actions provided a basis to hold her in contempt. The court declined to rule on the custody issue at that time, however, instead deciding to withhold a determination until it could interview the children in early August 2010, soon after father's summer parenting time ended.

Before that interview could occur, mother and father again appeared before the court, this time because of a dispute over when mother could exercise her two weeks of uninterrupted summer time with the boys. According to father's allegations, which mother did not deny, mother had chosen to exercise her summer parenting at the same time that father and his fiancée planned to be married, in a transparent attempt to keep the children from attending father's wedding. During a hearing called to deal just with that issue, the trial judge, who repeatedly and unsuccessfully had attempted to get mother to promise that she would return the children to father in time to attend his wedding, ultimately

granted father's motion to modify mother's summer parenting schedule to ensure that the children could attend the wedding and reception.

The court interviewed the children in chambers in August 2010 and subsequently ruled that changing custody from mother to father would be in the children's best interests. Accordingly, the court awarded father custody and designated parenting time for mother under the model parenting plan. Mother filed a motion to reconsider the change in custody, which was denied, and she now appeals. For the reasons set out below, we affirm.

In general, a party seeking a change of custody must show, first, that "there has been a substantial change in circumstances since the last custody order" and, second, "that it would be in the child's best interests to change custody." *Travis and Potter*, 236 Or App 563, 566, 237 P3d 868 (2010), *rev den*, 349 Or 603 (2011). In this case, the trial court focused on mother's interference with the children's relationship with their father, which, as we have explained, can constitute a "substantial change of circumstances":

> "[A] change of circumstances, by very definition, is a change in the capacity of either the moving party or the legal custodian to take care of the child properly. A component of the capacity of a custodial parent to take care of a child properly is the promotion by the custodial parent of a healthy relationship between the children and the noncustodial parent. Thus, depending on the facts of a particular case, anger, hostility, and interference with a noncustodial parent's parenting time may constitute a substantial change of circumstances for purposes of a change of custody."

*Garrett and Garrett*, 210 Or App 669, 673, 152 P3d 993 (2007) (internal quotations omitted); *see also Heuberger and Heuberger*, 155 Or App 310, 315, 963 P2d 153, *rev den*, 328 Or 40 (1998) ("interference with parenting time must be substantial to justify a change of custody on that basis").

Mother does not contest the trial court's findings about her interference with father's parenting time. Nonetheless, she argues that insufficient evidence supports the trial court's conclusion that her actions arose to a substantial change in circumstances. Specifically, mother contends that

the amount of parenting time that father missed "was far too little to equate to a substantial change in circumstances," that her false report to DHS did not constitute a change in circumstances, and that her actions have not adversely affected the children.

We first address mother's contention that the quantity of her interference was insufficient to amount to a change in circumstances. Mother argues that her interference caused father to miss far less parenting time than was missed in other cases in which we held that the loss of parenting time did *not* constitute a change in circumstances that justified a change in custody. Accordingly, mother concludes, the trial court erred in finding a change in circumstances here. *See, e.g., Morton and Morton*, 53 Or App 301, 632 P2d 1 (1981); *Hansen and Hansen*, 48 Or App 193, 616 P2d 567 (1980). We reject mother's argument for at least two reasons.[3]

First, the cases that mother cites do not specifically address the issue raised here: the degree of a custodial parent's interference with the noncustodial parent's parenting time that may constitute a *change in circumstances*. Rather, those cases either addressed only the ultimate *custody* determination or conflated the change-in-circumstances analysis with the best-interests determination. *See Francois and Francois*, 179 Or App 165, 170-71, 39 P3d 265 (2002) (discussing a tendency in some earlier cases to "conflate the two separate steps in proper custody modification analysis"). In fact, most of the cases cited by mother do not discuss whether the facts alleged constituted a change in circumstances at all. On the particular facts of *Hansen*, for example, we concluded that changing custody because the mother had allowed the father only a handful of visits with the children in over two years, "punishe[d] the children too much and the mother not enough." 48 Or App at 202. We did not discuss, however, whether the "substantial, believable evidence that mother [had] acted in a manner designed to alienate the children

---

[3] Because neither party raises it, and because the trial court did not consider it, we do not consider the effect, if any, of ORS 107.135(11), which provides that

"[i]n a proceeding under this section to reconsider provisions in a judgment relating to custody or parenting time, the court may consider repeated and unreasonable denial of, or interference with, parenting time to be a substantial change of circumstances."

from their father" was sufficient to establish a change in circumstances. *Id.* at 199. The other cases cited by mother reflect a similar lack of precision in describing what does and does not constitute a change in circumstances.

Furthermore, and perhaps most significantly, mother's argument that the *quantity* of her interference was insubstantial ignores the fact that the *quality* of a custodial parent's interference also is important to the "change in circumstances" analysis. Indeed, we repeatedly have explained that when a claimed change in circumstances is based on events indicating the custodial parent's failure to promote a healthy relationship between a child and the noncustodial parent, those events must be " 'of [such] a nature *or* number [reflecting] a course of conduct or pattern [that] has had or threatens to have a discernable adverse effect upon the child.' " *Buxton v. Storm*, 236 Or App 578, 592, 238 P3d 30 (2010), *rev den*, 349 Or 654 (2011) (quoting *Niedert and Niedert*, 28 Or App 309, 314, 559 P2d 515, *rev den*, 277 Or 237 (1977)) (emphasis added; bracketed material in *Buxton*). Here, the trial court did not rely only on the number of days of parenting time lost to support a finding of a substantial change in circumstances; to the contrary, the court said that it would not have found the number of missed days alone to be sufficient. Rather, the court emphasized evidence indicating that the *nature* of mother's interference was calculated to undermine father's relationship with the children.

Focusing first on the existence of a "course of conduct or pattern" of inappropriate behavior, the trial court found the "evidence just overwhelming" that mother had "interfered with [father's] visits intentionally, repeatedly, substantially." The court also found that most of mother's interference was "contemptuous" and that it had "really gone on from the first day, * * * during the entire history of the litigation" of the custody of the children. In other words, mother's willful interference with father's parenting time was not sporadic or episodic, but was a continuing problem.

Moreover, mother did not simply keep the children from father, but did so in a particularly manipulative and hurtful way. The trial court found both that mother had

made a "baseless" allegation about the children being sexually abused while in father's care and that mother specifically intended the allegation to "eliminate [father's] parenting time with his children, perhaps his relationship with his children." Mother's false accusation resulted in the children needlessly being interviewed by a DHS worker about sexual-abuse allegations and, even though DHS already had determined that the allegations were unfounded, mother still insisted on keeping the children away from father over the Christmas holidays. The evidence also established that mother denied father parenting time around Z's birthdays and that she attempted—and likely would have succeeded, absent court order—to prevent the children from attending father's wedding. The trial court held that the character and level of mother's interference with father's parenting time, combined with her allegations of abuse and threats to deny more parenting time and to move the children farther away from father, constituted a change in circumstances. The record supports the court's factual findings, which we conclude are legally sufficient to support its determination that mother's behavior constituted a substantial change in circumstances. *Compare Heuberger*, 155 Or App at 316 (no change in circumstances where the mother's conduct did not evince an intent to alienate the child from the father, the father's relationship with the child had not suffered, and where the mother's interference with the father's parenting time had stopped three months before the custody-modification motion).

Mother's additional arguments do not affect our conclusion. Mother first suggests that her false allegations about possible sexual abuse were not, standing alone, sufficient to establish a substantial change in circumstances. But the trial court did not rely on that factor alone; rather, it properly considered *all* of the ways in which mother had interfered with father's relationship with the children before concluding that a substantial change in circumstances had occurred. We also reject mother's contention that a "change of circumstances" finding was not warranted because the children have not been harmed by her actions. "When dissolution requires that custody be given to one parent, it is essential that the parents do nothing to intentionally interfere with the bonds of love

and affection the child may develop for each parent." *Birge and Birge*, 34 Or App 581, 585, 579 P2d 297 (1978). In this case, mother behaved particularly egregiously, by trying to deny father opportunities to share significant events with the children, like holidays, birthdays, and father's wedding. Regardless of whether those actions already have estranged the children from father, mother's conduct unmistakably threatens the children's ability to have a healthy relationship with him.[4] As a matter of law, that threat of harm is sufficient to support a change in circumstances. *Buxton*, 236 Or App at 592.

Finally, mother argues that the trial court improperly changed custody only to punish her for her actions. We disagree. The statement on which mother relies—the trial court's assertion that, having changed custody, it would not hold mother in contempt—reflects only the court's recognition that the change in custody made any contempt sanction unnecessary, perhaps because mother no longer would be able to deprive father of his parenting time.

In a second assignment of error, mother challenges the trial court's determination that both parents had served in the role of primary caregiver "throughout these children's lives at different times." *See* ORS 107.137(1)(e) (designating "the preference for the primary caregiver of the child" as one factor relevant to a best-interest finding). Mother acknowledges that she did not object to the court's primary-caregiver determination below, but asserts that the trial court committed plain error by making that determination because no evidence in the record supports it. In addition to requesting that

---

[4] Relatedly, mother argues that the trial court erred when it found that her conduct had been "disruptive to [the children's] lives and upsetting." Mother's argument is premised on her contentions that (1) the trial court found as fact that the children were upset by her behavior and (2) no evidence supports that finding. We disagree on both points. First, the trial court may have used the word "upsetting" only to reflect the ways in which the children's *lives* must have been "upset" by, for example, being driven for hours to a meeting point only to have mother then decide not to hand the children over to father. Second, even assuming the trial court determined that the children *themselves* had been upset by mother's behavior, we do not believe the record is devoid of support for that finding. The trial court could have concluded that mother's behavior was "upsetting" to the children based on the demeanor they exhibited during the in-chambers discussion about the custody dispute, which included the children's repeated expressions of concern that they would be "in trouble" if they expressed their opinions on that topic.

we exercise our discretion to address the unpreserved claim of error, mother also asks us to review the trial court's primary-caregiver determination *de novo* and to find that mother always has served as the primary parent of the children. *See* ORS 19.415(3)(b) (on review, the Court of Appeals may try the cause anew or "make one or more factual findings anew upon the record"). Mother argues that this "factual finding was central to the trial court's conclusion that it was in the best interests of the children that custody be transferred to father," and she concludes that, "once corrected, the trial court's analysis collapses."

For both jurisprudential and more case-specific reasons, we decline to address mother's unpreserved argument that no evidence supports the trial court's primary-caregiver determination and, concomitantly, we decline to conduct *de novo* review of that determination. First, general preservation principles counsel against addressing this type of unpreserved error. We exercise the "utmost caution" when addressing unpreserved arguments, and we are reluctant to do so when the evidentiary record might have developed differently had the pertinent issue been raised in the trial court. *See, e.g.*, *Peeples v. Lampert*, 345 Or 209, 219-20, 191 P3d 637 (2008) (appellate courts must exercise the "utmost caution" when addressing unpreserved arguments, in part because "preservation fosters full development of the record, which aids the trial court in making a decision and the appellate court in reviewing it"); *State v. Castrejon-Ruiz*, 220 Or App 637, 644, 188 P3d 400, *rev den*, 345 Or 503 (2008) (declining to address unpreserved constitutional claims where "the state might have sought to create a different record to address" those claims had the defendant raised them below). Here, had mother objected to the sufficiency of the evidence about father's role as a primary caregiver, father might have been able to present additional evidence or argument on that point. *Cf. Jett v. Ford Motor Company*, 192 Or App 113, 124, 84 P3d 219 (2004) (trial courts have discretion to reopen the record to allow a party to present additional evidence). Moreover, had mother objected to the trial court's assertion that father had been the children's primary caregiver at some point in their lives, the court would have had an opportunity to explain what it meant by that statement, which could have

obviated the need for this court to address the issue on appeal. That, too, counsels against the exercise of plain-error review. *Peeples,* 345 Or at 219-20; *see Ailes v. Portland Meadows, Inc.,* 312 Or 376, 382 n 6, 823 P2d 956 (1991) (providing a nonexclusive list of factors that appellate courts should consider in determining whether to address unpreserved claims of error, including "whether the trial court was, in some manner, presented with both sides of the issue and given an opportunity to correct any error").

Second, we decline to review mother's unpreserved challenge to the primary-caregiver determination because we are persuaded that it was not important to the trial court's resolution of the best-interests question. In making the best-interests determination, a court considers:

"(a)   The emotional ties between the child and other family members;

"(b)   The interest of the parties in and attitude toward the child;

"(c)   The   desirability   of   continuing   an   existing relationship;

"(d)   The abuse of one parent by the other;

"(e)   The preference for the primary caregiver of the child, if the caregiver is deemed fit by the court; and

"(f)   The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. However, the court may not consider such willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in a pattern of behavior of abuse against the parent or a child and that a continuing relationship with the other parent will endanger the health or safety of either parent or the child."

ORS 107.137(1).

Here, the trial court emphasized that (1) its custody ruling was based on a review of testimony from all the various hearings, (2) this case had been "fairly closely balanced as to which parent would be the more appropriate custodial parent" from the beginning, and (3) the best-interests "factors of ORS 107.137, as [the court had] balanced them * * *

[had] been in flux throughout."[5] The court ultimately concluded that, although the children should maintain a relationship with mother, the desirability of continuing her role "as the primary caregiver for the kids" was diminished significantly by her repeated denials of, and attempts to further limit, father's parenting time with the children—denials that the court believed would continue absent a change in custody. The court therefore found that the ORS 107.137(1)(c) "continuing relationship" factor weighed in father's favor. Based on that finding, as well as its finding that mother's "baseless" report to DHS was calculated to interfere with father's relationship with the children, the court concluded that a change of custody to father was in the children's best interests. *See* ORS 107.137(1)(f).

Those findings lead us to conclude that, regardless of whether the trial court erred in determining that father had been a primary caregiver at some point during the children's lives, neither the "competing interests of the parties" nor the "ends of justice" would prompt us to exercise our discretion to review the claimed error. *See Ailes*, 312 Or at 382 n 6 (listing factors pertinent to decision whether to correct plain error). The trial court was presented with the difficult question of which of two fit and loving parents would make the better custodial parent for the children. In making that determination, the court emphasized that it was drawing upon its lengthy experience with these parents in concluding that the children's interests would best be served by granting custody to the parent who could better ensure their continued relationships with the other parent. Thus, we are satisfied that, even if the trial court had recognized a primary-caregiver preference in mother's favor under ORS 107.137(1)(e), the court *would not have concluded that the preference outweighed the other factors that favored granting custody to father. See* ORS 107.137(2) (requiring that a child's best interests "not be determined by isolating any one of the relevant factors referred to in [ORS 107.137(1)]"). That is particularly true given that no evidence suggests that the children demonstrated a significantly stronger attachment to mother

---

[5] The same trial court judge presided over each of the multiple hearings in this highly contentious and lengthy custody dispute.

than to father or that they would suffer any severe emotional effects from a change in custody. *Compare Turner and Muller,* 237 Or App 192, 204, 238 P3d 1003 (2010), *rev den,* 350 Or 231 (2011) (holding, on *de novo* review, that the mother's failure to facilitate and encourage a positive relationship with the father was counterbalanced by the preference for mother as the primary caregiver, given the child's strong attachment to the mother and testimony that a change in custody would severely threaten the child's psychological well-being and sense of safety).

In sum, because we conclude that the primary-caregiver factor did not weigh heavily in the trial court's analysis of the best interests of the children, we do not exercise our discretion to review mother's unpreserved challenge to that determination, *de novo* or otherwise. *See State v. Toquero,* 228 Or App 547, 553-54, 208 P3d 1026 (2009) (declining to review unpreserved claim of error where Court of Appeals was confident that, if it remanded the case, the trial court would reach the same result by a different route). Mother does not meaningfully challenge the trial court's best-interests determination on any other basis. Under the circumstances, we perceive no persuasive reason to set aside the trial court's determination that a change in custody serves the children's best interests. Accordingly, we affirm.

Affirmed.