Argued and submitted July 21, 2014, reversed and remanded with instructions
to enter an award of custody to mother; otherwise affirmed March 4, 2015

In the Matter of the Marriage of
Angela MILLER,
*Petitioner-Appellant,*
*and*

Russell E. MILLER,
*Respondent-Respondent.*

Lane County Circuit Court
151113362; A151244

345 P3d 436

Beth Eiva argued the cause and filed the reply brief for appellant. On the opening brief were Sarah Peterson and Metcalfe & Peterson LLC.

James A. Palmer argued the cause and filed the brief for respondent.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

ARMSTRONG, P. J.

## ARMSTRONG, P. J.

In this custody case, mother appeals a judgment of dissolution awarding custody of their two children to father.[1] Mother argues that the trial court legally erred in its application of the statute that governs child custody awards, ORS 107.137. We agree. We conclude that the trial court impermissibly relied on the "conduct, marital status, income, social environment or lifestyle" of mother, ORS 107.137(3) (2011), *amended by* Or Laws 2013, ch 72, § 1, in its decision to grant custody to father.[2] We also conclude that the trial court legally erred in concluding that ORS 107.137(1)(f)—willingness and ability of a parent to foster a relationship between the child and the other parent—preponderated in favor of father based on mother's move to a new residence and the concomitant change in the children's school. Accordingly, we reverse and remand to the trial court with instructions to enter an award of custody to mother based on the statutory preference for the primary caregiver, ORS 107.137(1)(e), and otherwise affirm. Our conclusion obviates the need to address mother's argument under ORS 107.137(2) that the trial court erred in concluding that father had not abused her.

As a preliminary matter, we decline mother's request that we exercise our discretion to review this case *de novo*, ORS 19.415(3), because it is not an exceptional case that merits such review. Accordingly, we state the facts consistently with the trial court's express and implied findings, to the extent there is evidence in the record to support them, and review the trial court's legal conclusions for legal error. *Nice v. Townley*, 248 Or App 616, 618, 274 P3d 227 (2012).

A couple of years after mother and father married, father enlisted in the Army. Mother and father then had two children together. Since her first pregnancy, mother has not worked outside of the home. Father was deployed overseas for 12 months during mother's first pregnancy and the birth

---

[1] Mother does not challenge the trial court's division of parenting time.

[2] After the trial court's ruling, the legislature amended ORS 107.137 to add an additional subsection, which resulted in renumbering other subsections in the statute. Or Laws 2013, ch 72, § 1. As a result, all of our references are to the 2011 version of the statute.

of that child and again for 14 months when the children were 3.5 years old and 18 months old, respectively. In mid-2008, father obtained an assignment in Eugene where mother had established a family home while father was deployed. Since 2008, father has had to leave the state about once a year for four to eight week periods for training. As a result of father's career, mother has been the primary caretaker of the children throughout their lives. Both parents are involved and appropriate with the children, and each agrees that the other is a good parent. By all accounts the children are happy, healthy, well-adjusted, "wonderful" children.

In April 2011, mother and father separated, although at first father remained in the family home. After an incident between mother and father in late April, father moved out. In June 2011, father moved in with his girlfriend. Around the same time, mother also began a relationship and became pregnant, but she and her boyfriend have not lived together. At the time of trial, mother's boyfriend was living with his mother, sister, and nephew in Lebanon, Oregon. Early on, father ran a background check on mother's boyfriend and discovered that he had prior convictions for DUII in 2003, theft in 2004, and methamphetamine possession in 2009, and was charged with driving while suspended in 2010. Mother testified that her boyfriend had already told her about the DUII and his suspended license and was honest about the other convictions when she asked him about them. Father also learned that the boyfriend's ex-wife had obtained a restraining order against the boyfriend during their divorce in 2006. Mother spoke to both her boyfriend and his ex-wife about that order and learned that it resulted from verbal altercations, that her boyfriend had not challenged it, and that it is no longer in effect. Mother's boyfriend has not used methamphetamine since his drug conviction. She allows the children to spend unsupervised time with her boyfriend when she runs errands, and she testified that he is appropriate with them and safe. Father does not approve of the children spending any time with the boyfriend because of his history.

Since the separation, mother has been living on financial aid she receives to attend college classes. After father moved out of the family home, the "house wasn't being

paid for," and father continued to come by and let himself in with his key without knocking. In September 2011, mother moved herself and the children in with a female friend in Junction City, which is 15 miles away from the family home. The Junction City residence is closer to the university where mother takes classes and somewhat closer to her boyfriend's home. In Eugene, the children had attended a Japanese immersion school located about a 10-minute drive from the family home. The move required the children to change schools to one that was open only four days a week. Mother takes the children to school in the mornings, but they ride home on the school bus, which takes an hour, because that is their preference. The children are on track in their new school, and one child's reading has improved since the move.

At the time of trial in January 2012, mother was not working but was continuing to attend school part time with the plan to finish her environmental chemistry degree in two years. She was preparing to give birth in the next month, but had not made plans with her boyfriend, who was not working, for him to contribute to her medical expenses or the child's support. Father had returned to living in the family home in Eugene with his girlfriend.

The trial court awarded custody of the children to father after a lengthy oral ruling that was incorporated into the final judgment. In making its ruling, the trial court announced findings and conclusions with regard to each factor under ORS 107.137(1). That statute provides, in part:

"(1) Except as provided in subsection (5) of this section, in determining custody of a minor child under ORS 107.105 or 107.135, the court shall give primary consideration to the best interests and welfare of the child. In determining the best interests and welfare of the child, the court shall consider the following relevant factors:

"(a) The emotional ties between the child and other family members;

"(b) The interest of the parties in and attitude toward the child;

"(c) The desirability of continuing an existing relationship;

"(d)   The abuse of one parent by the other;

"(e)   The preference for the primary caregiver of the child, if the caregiver is deemed fit by the court; and

"(f)   The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. * * *

"(2)   The best interests and welfare of the child in a custody matter shall not be determined by isolating any one of the relevant factors referred to in subsection (1) of this section, or any other relevant factor, and relying on it to the exclusion of other factors. * * *

"(3)   In determining custody of a minor child under ORS 107.105 or 107.135, the court shall consider the conduct, marital status, income, social environment or lifestyle of either party only if it is shown that any of these factors are causing or may cause emotional or physical damage to the child."

For ORS 107.137(1) factors (a) to (c), the court found that those factors weighed equally for both parents. For factor (d), the court found that father had not abused mother. For factor (e), the court found that mother was the children's primary caregiver because of father's career, which was a choice made by both mother and father. The court found that "[t]hese children have thrived as a result of the arrangement that was made between the parties and that's a really positive thing." The trial court also commended mother for doing an "outstanding job" as a mother, which included moving and periods of single parenting when father was deployed. With regard to father's testimony about mother being "controlling" or "protective" of her parenting time with the children, the court found that it was understandable because of the circumstances and strain from that military life and the time it took for father to reintegrate into family life after returning from deployment.

The trial court then turned to factor (f), "[t]he willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." Because it was the deciding factor for the court, we quote at length the trial court's findings, reasoning, and conclusions with respect to that factor:

"The willingness of each parent to facilitate a close relationship with the other parent. Now, mother claimed that she moved to Junction City to be closer to OSU and that the father was not paying the mortgage, was coming over without knocking and she couldn't lock the doors because they both still own the house.

"I didn't hear testimony about why Junction City or what thought went into moving the kid's school or going to Harrisburg, especially going to a school that only seems to be school four days a week. I do know from experience that the school that they were in was a wonderful one and maybe Harrisburg is great, too.

"I just have more knowledge with the Eugene School and moving that far away and I took note of the fact that mother did not move to be closer to her parents because they live in Cottage Grove, so it was to be closer to her school. Now, conveniently, that's also a little closer to where the boyfriend is who is the father of the [unborn] child.

"So, uprooting the kids for those reasons troubled me and there was testimony—the testimony wasn't really clear about how much consultation was done with father about the switch. There was no testimony about where else mother looked to go live or why there?

"I know she has a roommate who testified and they are both students, but the woman who testified is a student in Springfield, so I don't see how moving out to Junction City was helpful, but hey, it was a person to live with who would maybe, perhaps help with childcare, someone who mother trusted.

"But, by moving the children so [sic] away from their family home, the mother was interrupting father's relationship with the children and the children's relationships with their neighbors and with their school mates and that was putting mother first and not children first.

"Mother either knew, or should have known, that this distance would [a]ffect father's relationship with the children because there's no way to have children in school and have them split the kids halftime.

"I respect when any person wants to further their education and mother had been attending school either online or in person for all these years and ma'am, you testified that you are a chemistry major.

"That tells me that you are a lot smarter than me because I probably couldn't even pass a chemistry class, but it's a very admirable thing to do and it can only help you in the future but ma'am, getting pregnant when you did—I don't know the circumstances of that—but you were still married to another man.

"The testimony was that you hadn't been in the relationship very long, so it's including a new man in the children's lives when they are trying to deal with their father being home and then moving, all of that, moving for school when you are about to have a third child and what you hope, be a single parent of now three kids, just didn't seem like a very good idea. Your testimony about finishing your degree in the next two years, that confuses me, too.

"Even though I respect you wanting to better yourself, how are you going to parent three kids, five days a week or four days a week while going to school? I just don't get it. I didn't understand it then and I don't understand it now.

"You've been living on student aid for years and while that certainly benefitted the family in terms of helping to pay for expenses and such, parenting three kids on your own and trying to keep up with the schooling, I don't understand that decision. I don't understand how there is not a plan that the father of this child isn't even going to help.

"There is no testimony about him having any source of income, or plan for him to provide any sort of assistance. He lives at home with his mother and his sister and his nephew, I believe the testimony was.

"He has three other children and I don't know if he's providing support for them, too, but there's going to be this new baby and this other man in your boy['s] and girl's li[ves], and how is that baby going to be supported, so the kids get moved.

"I was looking through the file and in your first Uniform Support Affidavit you even mention how it wouldn't be good for the kids to be on a bus 2 hours a day, but the kids are on a bus, at least one hour a day and in your testimony, that's what they want to do?

"Well, kids want to eat ice cream for dinner and watch TV all night or at least mine did. It's not about what the kids need, it's about what's best for them and I don't think

that move was best for them. It seemed to suit you and your needs and not theirs.

"People often don't have control over who they fall in love with, and I don't think the father of your baby was particularly honest with you about his convictions. I don't know if that would have made a difference to you.

"Maybe it would not, because I think you said something about people can change, and they can, and they do, and I will always believe that or I will not put this dress on in the morning, because that's what we all have to hope, generally, is that people can change for the better.

"But, you not knowing about the things that he was involved in and exposing him to your children didn't show such great discretion. He doesn't have a driver's license. He can't help with the baby in terms of being able to even drive.

"So, all of these circumstances, and again, I'm being judgmental, [a]ffect [the children] and that's what I'm here to do is decide how [the children] should live and these most recent choices of mother do not impact positively on [the children's] relationship with mother or with father.

"So, with all that, I am going to give custody to father."

Thus, the trial court's decision to grant custody to father was based on mother's choices to move the children 15 miles away from their former home to live with a trusted friend, to continue her college education, and to have a baby with her boyfriend, who did not have a visible means of support or a driver's license. However, ORS 107.137(3) provides that a court may consider such lifestyle factors *only if* they will or may cause *damage* to the child: "In determining custody of a minor child under ORS 107.105 or 107.135, the court shall consider the conduct, marital status, income, social environment or lifestyle of either party only if it is shown that any of these factors are causing or may cause emotional or physical damage to the child." We previously have referred to such matters as those that are "harmful to the child's welfare." *McArthur and Paradis*, 201 Or App 530, 537, 120 P3d 904, *rev den*, 339 Or 609 (2005); *cf. Maddox and Maddox*, 56 Or App 345, 349, 641 P2d 665 (1982) (expert testimony of concern about the amount of adult sexual activity the children were exposed to in mother's new home and

pressure to engage in sexual play by mother's boyfriend's daughter was evidence that mother's lifestyle was causing emotional damage to the children). Damage to a child under ORS 107.137(3) is *not* met merely because a parent's lifestyle choices make coparenting with the noncustodial parent more difficult, *nor* merely because the choices are met with disapproval by the other parent. *See McArthur*, 201 Or App at 537 (finding that parenting plan that required the child to observe the Sabbath with the mother, which disrupted the father's desired weekend family time with the child, was not harmful to the child's welfare). Here, the trial court did not make any findings that mother's lifestyle choices presented a risk of emotional or physical damage to the children, nor can we infer any such findings from the trial court's decision on the record.

In the trial court's discussion of mother's life choices, the trial court never hinted that it found that those choices were causing or might cause emotional or physical damage to the children. Rather, the trial court's ruling was based on disapproval of mother's recent choices—particularly becoming pregnant by her boyfriend—and do not reflect an attempt to articulate how those choices might *damage* the children (that is, threaten their welfare). ORS 107.137(3) sets a much higher standard to be met before the court may factor parental lifestyle choices into its custody determination than the standard the trial court used here—that different choices would be better for the children. Indeed, the trial court found, directly contrary to the damage standard in ORS 107.137(3), that the children were thriving, that both father and mother were appropriate with the children, and that both mother and father thought that the other parent was a good parent.

Because the trial court's express findings preclude an implicit finding that the children were at risk of emotional or physical damage from mother's lifestyle, it was legally impermissible for the trial court to consider mother's reasons for her move, her financial situation, her personal situation with her boyfriend and pregnancy, and her decision to continue her schooling. Moreover, none of those considerations has anything to do with whether mother was willing and able to facilitate a positive relationship between

father and the children, ORS 107.137(1)(f). Unfortunately, those impermissible considerations were the entire backbone of the trial court's finding that factor (f) preponderated in father's favor, and of its ultimate conclusion that granting custody to father was in the children's best interests. The trial court legally erred in basing its custody decision on those impermissible factors.

Turning back to factor (f)—"[t]he willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child"—the only finding that the court made that remotely relates to that factor was that mother's move and the concomitant change in the school that the children attend made it more difficult for father to spend additional time with the children. However, those circumstances have no bearing on factor (f). That factor relates to a parent's *willingness and ability* to foster a relationship between the children and the other parent—*viz.*, a parent's encouragement of a positive relationship with the other parent, or conversely, behaving in a manner that undermines that relationship. *See, e.g., Kirkpatrick and Kirkpatrick*, 248 Or App 539, 553, 273 P3d 361 (2012) (trial court findings that the mother's attempts to interfere with the father's parenting time and baseless report to the Department of Human Services about the father, which related to factor (f), supported the trial court's decision to grant custody to the father); *Turner and Muller*, 237 Or App 192, 203-04, 238 P3d 1003 (2010), *rev den*, 350 Or 231 (2011) (discussing factor (f) in relation to the mother not understanding that fostering a positive relationship with the father required respectful interactions with the father in front of the child); *Travis and Potter*, 236 Or App 563, 567, 237 P3d 868 (2010), *rev den*, 349 Or 603 (2011) (discussing factor (f) in relation to the parent either encouraging or undermining the child's relationship with the other parent).

The court made no findings regarding mother's willingness or ability to encourage a positive relationship between father and the children. For example, the trial court did not make any findings that suggest that the trial court thought that mother's choices were directed at hampering the children's relationship with father. In contrast,

the trial court found that mother being "protective of her time" with the children was "understandable" and had to do with mother being accustomed to being a single parent while father was deployed as a soldier and with the time that it took for father and mother to reintegrate father back into family life. The court simply found that geography made things more difficult for father. However, that is a circumstance that is true for every noncustodial parent where the father and mother do not live in close proximity, and it is not a circumstance, in and of itself, that bears on whether the custodial parent is willing and able to foster a positive relationship with the noncustodial parent. There is no evidence in this record from which the court could have found that mother tried to hamper father's positive relationship with the children.

The trial court legally erred in finding that factor (f) favored father based on findings that do not address the legal requirements in ORS 107.137(1)(f). As a result, based on the balance of the trial court's findings, all of the factors weighed equally for each parent, except that mother was the primary caregiver. Because of the statutory preference for fit primary caregivers, ORS 107.137(1)(e), the trial court was thus required to award legal custody to mother, whom the trial court found to be an outstanding mother, aside from the impermissible considerations discussed above. *See Nice*, 248 Or App at 623 (emphasizing that the trial court must consider the preference for the primary caregiver in an award of custody).

Because the trial court erred in relying on the impermissible considerations in ORS 107.137(3) and erred in relying on irrelevant facts in concluding that ORS 107.137(1)(f) preponderated in favor of father, we reverse and remand to the trial court with instructions to award custody to mother based on the statutory preference for the primary caregiver, ORS 107.137(1)(e).

Reversed and remanded with instructions to enter an award of custody to mother; otherwise affirmed.